# OSCAR LESER ET AL.

## vs.

## BOARD OF REGISTRY.

*Elections—Action of Registry Board—Review by Court—United States Constitution—Nineteenth Amendment—Ratification by States.*

That, upon an application for registry as a qualified voter, the right of the appellant to register was challenged, in his presence, by a citizen of Maryland and resident of that city, who filed with the board of registry a written memorandum of the grounds of the challenge, whereupon the board conferred, and announced a decision overruling the challenge and allowing the applicant to register, a formal entry being made on the registration book of the challenge, of the filing of the memorandum, and of the action of the board, was sufficient, under Code, Art. 33, sec. 19, to justify a petition to a court, under section 25, asking for the correction of the registry.           pp. 56-59

In view of various decisions by the Federal Supreme Court, the right of the Congress of the United States to propose amendments to the Constitution forbidding discrimination by the United States and the several states against any class of its citizens in regard to their rights to vote must be regarded as finally settled.           p. 65

The Nineteenth Amendment to the United States Constitution, providing that the right to vote shall not be denied or abridged on account of sex, was validly adopted and ratified.

pp. 60-67

The people of any one of the several states cannot, by a provision in the state constitution, impose any limitations upon the ratification of amendments under the amending power created by the Fifth Article of the United States Constitution. pp. 68-70

The ratification of an amendment to the United States Constitution is not "legislation" within the meaning of the rules of a state legislature governing the procedure in dealing with legislation before it.           pp. 72, 73

Two bills originating in different houses of a state legislature do not together constitute one measure, and consequently a rule of one house forbidding debate upon a matter already determined in that session, unless it is voted to reconsider, does not prevent consideration of the same matter when embodied in a bill or resolution coming from the other house.        pp. 72, 73

After the ratification of an amendment to the United States Constitution has been approved by a majority of a quorum of each branch of a state legislature, subsequent proceedings in connection with a motion to reconsider cannot affect the validity of such approval. ·                                                         p. 73

*Decided June 28th, 1921.*

Appeal from the Court of Common Pleas of Baltimore City (Heuisler, J.).

Petition by Oscar Leser and others, against J. Mercer Garnett and others, constituting the Board of Registry of the Seventh Precinct of the Eleventh Ward of Baltimore City, asking that the names of Cecelia Street Waters and Mary D. Randolph be stricken from the registry of voters, by reason of disqualification on account of sex. From an order dismissing the petition, petitioners appeal. Affirmed.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Adkins, and Offutt, JJ.

*William L. Marbury, George Arnold Frick,* and *Thomas F. Cadwalader,* with whom was *Samuel K. Dennis* on the brief, for the appellants.

*Everett P. Wheeler,* of New York, on behalf of Charles S. Fairchild, president of the American Constitutional League, as *amicus curiae.*

*J. Seymour T. Waters,* on behalf of David Holmes Morton, a citizen of New York, as *amicus curiae,* also filed a brief.

*Alexander Armstrong, Attorney General,* with whom was *Lindsay C. Spencer, Assistant Attorney General,* on the brief, for the Board of Registry.

*George Moore Brady, Roger Howell* and *Jacob M. Moses* for Caroline Roberts et al., intervening respondents.

*W. L. Marbury* for appellants: The so-called Nineteenth Amendment is void because outside of the scope of the grant of power to amend the Federal Constitution delegated in Article V to Congress and Legislatures by the sovereign people. The people in adopting the Constitution intended to form an indestructible union of indestructible states. These states were self-governing and it was intended that as to local matters they should remain so, and that they should not be destroyed through the operation of any part of the Constitution. *Lane Co.* v. *Oregon,* 7 Wall. 71; *Texas* v. *White,* 7 Wall. 700. It is impossible to conceive that the people intended the states to be indestructible and at the same time intended to delegate to any agencies of the people the power to destroy them.

The taxing power, granted by the people in the broadest general terms to Congress, though subject to several express limitations, such as apportionment of direct taxes, etc., has nevertheless been held subject to the *implied* limitation that it must not be used so as to destroy the States or impair their independence in the discharge of the functions belonging to them. *Collector* v. *Day,* 11 Wall. 113. On the same principle the amending power must be limited or the whole purpose of the Constitution may be subverted.

The express proviso in Article V contemplates and requires that a State be able to consent or refuse to consent to any amendment depriving it of its equal suffrage in the Senate. This necessarily involves its control over its own internal suffrage and the qualifications of voters, as otherwise the voters who will not consent might be disqualified by amend-

ment and the "consent" of the remainder then obtained, thus nullifying the force of the proviso. The Nineteenth Amendment, if valid, takes from Maryland the power of consenting or refusing to consent to further amendments, for it changes her electorate and substitutes a new body of voters of whom one-half are qualified, not by the State but by the external amending power.

The Fifteenth Amendment has never been held valid by the Supreme Court in any reasoned opinion, and indeed its validity was never questioned until forty-five years after its adoption, when *Myers v. Anderson,* 238 U. S. 368, was argued. It was then too late to ignore the long continued and universal acquiescence in it as part of the Constitution, and the Supreme Court merely assumed its validity. It was originally adopted not by free act but by compulsion on many states as a result of the Civil War, and as a condition of their restoration to the Union, and for these reasons it is not a precedent for any similar measure adopted in times of peace, and not protected by long acquiescence against challenge of or inquiry into its validity.

Missouri never ratified the amendment because by her Constitution she forbade her legislature ever to ratify any amendment that might impair the right of local self-government of her people. This is such an amendment. It deprives the people of the most fundamental right of local self-government, the right to determine who shall govern the State, who in a political sense shall *constitute the State.*

The amending clause gives to the States the right to say "when" they shall ratify by either of the methods provided. No duty to ratify is imposed on them. They can therefore either say, as in Tennessee, "not until after an election has intervened," or as in Missouri, respecting such amendments as the Nineteenth, "never." The Legislatures of the States are the creatures of and governed by their State Constitutions. *Haire v. Rice,* 204 U. S. 291. The Supreme Court in *Hawke v. Smith,* 253 U. S. 226, merely held that a referen-

dum could not be provided as a third alternative method of ratification besides those designated in Article V.

West Virginia and Tennessee never ratified in fact, as under their rules of procedure their final action in each case in one House was a defeat of the resolution. In both States the legislative journals are the best evidence of the passage of bills, etc. *State* v. *Osborne,* 5 W. Va. 85; *State* v. *Algood,* 87 Tenn. 163, etc.

*J. M. Moses* for intervening respondents. The proclamation of the Secretary of State of the United States that the amendment has been ratified is conclusive and cannot be inquired into by the Court. It is determined by the political department. *Worman* v. *Hagan,* 78 Md. 163. But were it not so, the certificates of the proper authorities of the several States that their Legislatures had ratified are conclusive and the journals are not to be received in evidence as contradicting them. *Field* v. *Clark,* 143 U. S. 649.

*Everett P. Wheeler* for Charles S. Fairchild. The amendment destroys rights reserved to the State by the Ninth and Tenth Amendments. These are fundamental and were conditional of the popular ratification of the Constitution itself and therefore cannot be impaired under the amending power as they limit Article V as well as other articles. The Prohibition Amendment was only sustained because the liquor traffic has always been deemed subject to the police power and not protected by ordinary Constitutional guarantees.

*Roger Howell* for intervening respondents. The ratifications certified to are valid. The rules of the West Virginia Senate and the Tennessee House relate to ordinary matters of legislation, not to the ratification of constitutional amendments, the power to ratify being derived not from the State but the Federal Constitution. *Hawke* v. *Smith,* 253 U. S. 226. No limitation on the power of amendment can be implied as in the case of the taxing power, because it is a power to change the entire Constitution, including the taxing power,

and even express limitations on that and other powers can be removed by amendment.

*George Arnold Frick* for appellants. The General Assembly of Maryland rejected the amendment as an assault upon the integrity of the State itself, which the Constitution was intended to preserve. If the amending power goes so far, the people have less right to self-government than they enjoyed before the Revolution under the Charter granted by the Crown. The act of other Legislatures in determining who shall vote in Maryland is mere irresponsible tyranny never contemplated by the founders.

*George Moore Brady* for intervening respondents. The amending power is reserved by the sovereign people themselves and is therefore substantially unlimited. The express proviso preserves equality of the States in the Senate and nothing more. This equality is not disturbed by the Nineteenth Amendment. The people may alter or abolish their Constitution by acting according to the forms prescribed, *i. e.,* by constitutional amendment. *Calhoun, Works VI,* pp. 37, 224. The Supreme Court implies, in the *Slaughter House Cases,* 16 Wall. 36, 77-78, that any result can be reached by amendments properly framed to accomplish it.

*Attorney General Armstrong* for the Board of Registry. There is no jurisdiction under Article 33, Section 25, to decide this case. The proceeding is appellate only. *Collier* v. *Carter,* 100 Md. 384; *Wilson* v. *Carter,* 103 Md. 120 ; *Smith* v. *McCormick,* 105 Md. 225 ; *Hanson* v. *Daly,* 129 Md. 287. There must be a lawful proceeding before the Board of Registry and a decision therein to lay a foundation for appealing by petition to the Court. The challenge in this case was informal and unauthorized, whereas the statute points out a definite procedure, making up a "suspected list," summoning the persons thereon, and affording them a hearing.

As to the validity of the ratification the certificates offered in evidence are conclusive. *Worman* v. *Hagan,* 78 Md. 163. The validity of the amendment is conclusively established by

the recognized validity of the Fifteenth Amendment, indistinguishable in form.

*Thomas F. Cadwalader* for appellants. The procedure is warranted, as the voters were challenged at the time of offering to register, and no summons was needed. The Board heard the challenge and overruled it, so that the petition was in fact an appeal from their action. Article 33, Section 25 expressly includes the case.

The Amendment is invalid because it violates directly the proviso of Article V. What is the suffrage of the State in the Senate? It is the votes cast by Senators elected in the State by the people thereof through electors who possess the qualifications prescribed by the State itself for electors of the most numerous branch of its Legislature. If an amendment gives the right of selecting Senators to persons other than those to whom the State has given the right, or takes away from the State's qualified electors, or dilutes their right to select them, it deprives the State of Senators of its own choice and hence of suffrage in the Senate. The State is not a mere district but a political body able as such to consent or dissent. But it cannot do this without an electorate and if the electorate is liable to be disfranchised in part, or expanded by the addition of voters that the State did not see fit to qualify, then its power of consent is entirely subject to the amending power. This is impossible to reconcile with the proviso. The Seventeenth Amendment merely changed the method of election but did not impair the real power of the people of the State in whose favor the guaranty runs. The Fifteenth Amendment was a settlement of war issues and recognized as such. When adopted, many states had been deprived of their suffrage in the Senate altogether. Its sanction rests on *vis major* followed by acquiescence, and therefore it constitutes no precedent.

OFFUTT, J., delivered the opinion of the Court.

Cecelia Street Waters, a white woman, and Mary D. Randolph, a colored woman, both citizens of Maryland, applied

on October 12th, 1920, to the Board of Registry of the Seventh Precinct of the Eleventh Ward of Baltimore City for registration as qualified voters therein. Aside from their sex, the applicants possessed the qualifications prescribed by the Constitution and laws of this State entitling them to the registration for which they applied. At the time they applied for registration, Mr. Oscar Leser, on his own behalf, and on behalf of the Maryland League for State Defense, challenged the right of each of the applicants to register as a qualified voter, on the grounds, first, that the applicants were *female* citizens of the State, whereas the Constitution of Maryland confined the right of suffrage to males, and second, that neither of them was entitled to register under the Nineteenth Amendment to the Constitution of the United States, because that amendment had never been "legally proposed, ratified or adopted as a part of the Constitution," and was invalid because it was "in excess of any power to amend the Constitution of the United States, conferred by the provisions of Article 5" of that Constitution. The challenges were overruled and the applicants duly registered.

Thereafter, on October 30th, 1920, Mr. Leser, and other citizens of Maryland, who were also members of the Board of Managers of the Maryland League for State Defense, filed a petition in the Court of Common Pleas of Baltimore City, in which the petitioners stated that they were aggrieved by the action of the Board of Registry in registering the names of the two women to whom we have referred, and asked that their names be stricken from the registry of voters of the precinct in which they were registered. In this petition the petitioners rest their claim for relief upon the following grounds:

First: "The said alleged amendment to the United States Constitution is not such an amendment as the Congress is authorized by Article V of the Constitution of the United States to propose to the legislatures of the several states to be by them ratified in accordance with said Article V, but is wholly outside of the scope and purpose of the amending power conferred upon

Congress, subject to the ratification by three-fourths of the State Legislatures, by the said Article, as is more fully and expressly set forth in the resolution of the General Assembly of Maryland rejecting and refusing to ratify the said amendment at the January Session of 1920."

Second: "That the said alleged Nineteenth Amendment to the Constitution of the United States was never in fact ratified by the Legislatures of three-fourths of the States now composing the United States of America, the proclamation dated August , 1920, by the Honorable Bainbridge Colby, Secretary of State of the United States, to the contrary notwithstanding.

"(a) Because of the fact that it was not ratified by the Legislature of the State of West Virginia, but on the contrary was defeated and rejected by the said Legislature."

Third: "And because although the Legislature of the State of Missouri undertook to pass a resolution ratifying the said measure, nevertheless it was forbidden to do so by the following provision of the Constitution of the State of Missouri:

" 'Article II, Section 3—We declare, That Missouri is a free and independent state, subject only to the Constitution of the United States; and as the preservation of the states and the maintenance of their governments are necessary to an indestructible Union, and were intended to coexist with it, the legislature is not authorized to adopt nor will the people of this state ever assent to any amendment or change to the Constitution of the United States which may in any wise impair the right of local self-government belonging to the people of this state.' "

Fourth: "Because the Legislature of the State of Tennessee, being a body corporate created under and in pursuance of the constitution of the said state and subject to the limitation therein expressed, undertook to act upon a resolution purporting to ratify the said alleged Nineteenth Amendment, yet its action in the premises was null and void for the reason that the mem-

bers of the said legislature were elected prior to the submission of the said amendment by Congress to the legislatures of the several states, and therefore by the provisions of the Constitution of the State of Tennessee, the said existing legislature was prohibited from acting upon said alleged amendment. The provision of said Constitution being as follows:

" 'No convention or General Assembly shall act upon any amendment of the Constitution of the United States proposed by Congress to the several states, unless such convention or General Assembly shall have been elected after such amendment has been submitted.'

"And because even if the Legislature of the State of Tennessee at its session held in the month of August, 1920, were competent to act in the matter of ratification of the said amendment to the Constitution of the United States, the said legislature did not pass any resolution ratifying the said alleged Nineteenth Amendment, but did, in fact, defeat and reject such resolution."

And Fifth: "That in a number of the states of the American Union, including the States of Massachusetts, New Jersey, Pennsylvania, Rhode Island, Arkansas, Maine, New Hampshire, Ohio, Iowa, Nebraska, Missouri, Texas, Kentucky and others, the people have seen fit to provide in their state constitutions that the rights and duties pertaining to the elective franchise shall be limited to men. In these states the people have also provided that no changes should be made in their state constitutions by any act or resolution of their state legislatures and have thereby in effect forbidden their said respective state legislatures to vote for the ratification of any proposed amendment to the Constitution of the United States which would have the effect of abolishing or changing the Constitution of the state."

In answer to this petition the respondents asserted, first, that the court was without jurisdiction to determine "the matters alleged in said petition, because to do so would be to

deny full faith and credit in this State to the public Acts, Records, and Judicial Proceedings of other States, in violation of Section 1 of Article 4 of the Constitution of the United States, and to question the validity of an official act duly performed by the Secretary of State of the United States," and because no application was ever made to the appellees to strike from the list of persons registered as qualified voters the two women alleged to have improperly registered, nor were their names placed upon the "suspected" list, nor any "other legal proceeding taken" before the appellees to prevent the registration of said persons or to strike their names from the list of qualified voters in said precinct, nor any hearing had before the appellees in reference to the right of the persons named to register in said precinct, and second, that the two women were not disqualified under the Constitution of the State of Maryland, or of the United States from voting at any election hereafter to be held.

Testimony was offered in support of the petition, and thirteen prayers presenting the legal propositions advanced by the appellants submitted, and after a hearing these prayers were refused and the petition dismissed. From that order this appeal was taken.

The substantial questions presented by the appeal are, first, whether the Court of Common Pleas of Baltimore City had jurisdiction to pass upon the matters contained in the petition; and second, whether the Nineteenth Amendment of the Constitution of the United States was validly adopted and ratified and is binding upon the several States of the Union and the people thereof, and we will consider these questions in the order in which we have stated them.

The appellee contended that "the court was without jurisdiction to entertain the petition because the petitioners did not bring themselves within the provisions of the election law authorizing petitions to strike names from the books of registry, and because it does not appear that any summons was served upon either of the persons registered," but we are un-

able to assent to the proposition thus stated, nor do we regard the decisions of this Court cited in support of it as applicable to the facts of this case. Those facts are that when the two women to whom we have referred applied to the Board of Registry to be registered as qualified voters, Mr. Oscar Leser, a citizen of Maryland and a resident of Baltimore City, in their presence challenged their right to register, and filed at the same time with the Board of Registry a written memorandum of the grounds of the challenge, and thereupon "the board conferred and announced a decision overruling" the challenge and allowed the applicants to register, and a formal entry was made on the registration book of the challenge, the filing of the memorandum and the action of the board thereon.

Section 19, Article 33, Code Public General Laws, which provides that "any voter shall be permitted to be present at the place of registration in any precinct of his county or city, and shall have the right to challenge any applicant, and when challenged such applicant shall be carefully questioned by the Board of Registry touching the facts which entitle him to register in such precinct, and thereupon, if a majority of the board is convinced that such applicant is a qualified voter, he shall be entered as qualified," was obviously designed to permit the very procedure which was adopted in this case. Indeed no other conclusion can be reached unless the plain and explicit language of that section is disregarded. Its purpose is to afford an opportunity for objection to the registration of a voter *before* his name has been placed on the registration book, while Section 20 of the same article which provides that: "If any voter of the ward or county shall go before the Board of Registry during such sessions and make oath that he believes any specified person *upon such registry* is not a qualified voter, such fact shall be noted," is designed to supply in part the procedure for striking off the name of a voter *after* it has been placed on the register. Nor is there anything in the history or the position of the section to indicate that its application is not general, and the right to object to the

registration of a disqualified person at the time of his application must have been within the contemplation of the Legislature, when it provided in Section 25 of the same Act that "any person who feels aggrieved by the action of any Board of Registry in refusing to register him as a qualified voter, or in erasing or misspelling his name, or that of any other person on the registry, or *in registering* or failing to erase the name of any fictitious, deceased or disqualified person, may at any time, either before or after the last session of the Board of Registry, but not later than the Saturday next preceding the election, if in the City of Baltimore, and not later than the Tuesday next preceding the election, if in the counties, file a petition, verified by affidavit, in the Circuit Court for the county, or if the cause of complaint arises in Baltimore City, in any court of Baltimore City, setting forth the ground of his application, and asking to have the registry corrected." And that section was designed to protect the right created by Section 19, *Ibid.*, by allowing a review of the action of the Board of Registry in regard to it.

Nor are the cases to which our attention has been called in conflict with this view. In *Collier* v. *Carter,* 100 Md. 381, the petition was filed for the purpose of having the name of one Brady, which was on the registration lists as that of a qualified voter, stricken therefrom. It contained "no suggestion of having for its object a review of any action taken or judgment rendered elsewhere," but in effect asked the court to exercise an original and not an appellate jurisdiction. And in *Wilson* v. *Carter,* 103 Md. 120, the facts were that the Board of Registry refused at the request of one of its members to place the name of a registered voter on the "suspected list" and "refused to take any action whatever" upon the request, and their non action was the basis of the petition in that case. The reason given for the request was that the building given as the residence of the voter was burned down, but there was no affidavit or other proof of that fact as required by Section 20 in such cases, nor was there any hearing upon the re-

quest. In *Smith* v. *McCormick,* 105 Md. 224, a petition was filed to strike the name of Thomas Carney from the registration lists of Baltimore City on the ground that he was not a qualified voter, and it appeared that his name had never been put on the "suspected list," and that his right to register had never been brought to the attention of the Board of Registry of the precinct in which he was registered and that no action was taken by that board as to it, and in *Hanson* v. *Daly,* 129 Md. 288, in which the petition was filed to have the name of Harry J. Daly stricken from the registration lists of Baltimore City on the grounds that he was not a qualified voter, it appeared that his name had never been placed on the suspected list, but it did not appear that any objection to his right to register had ever been made to the Board of Registry. The reason for the decision in each of those cases was very plainly stated by this Court, speaking through JUDGE BURKE, in *Smith* v. *McCormick,* 105 Md. 226, in which it said, "the courts have been uniform in holding, that their jurisdiction in such matters was appellate, and not original, and that unless there was some action taken by the officers of registration upon objections properly before them as to the registration of a disqualified person the court was without power to review or correct any error committed by those officers." But in this case it does clearly appear that the objection to the registration of the applicants was brought directly to the attention of the board and that they formally acted on it. Nor is there any force in the contention that the applicants had no notice. They needed no formal notice because they were present and participated in the proceeding. The section itself does not provide for any notice, because under it the challenge is made in the presence of the applicant and before he registers. Under such circumstances any other or further notice would be an idle and meaningless ceremony.

For the reasons assigned we are of the opinion that the Court of Common Pleas did have jurisdiction in this case.

This brings us to the consideration of the second and prin-

cipal question presented by the appeal, and that is, whether the Nineteenth Amendment of the Constitution of the United States was validly adopted and ratified and is binding upon the several states of the Union and the people thereof.

In the beginning, it may be well to restate what has become trite from over repetition—the functions, the powers, and the limitations of this Court in dealing with such questions. This is a court of law. Its function is to ascertain, state and apply the law in its relation to facts involved in litigation before it. It is authorized to interpret and apply the principles of existing law. But whilst it may apply old and long established principles to new uses, it cannot make new law. Nor can it do what is in effect the same thing,—modify, amend or repeal existing law. In the exercise of these duties and functions, this Court must concede to the Constitution and statutes of the United States, and the decisions of the Supreme Court construing the same, a binding and permanent force as have, when not in conflict with the Federal Constitution, the Constitution and laws of this State, and the decisions of this Court in dealing with them. With the wisdom, the expediency or the effect of such laws we have properly nothing to do, except in so far as those considerations may aid in the construction of the law.

In dealing, therefore, with this question we are constrained to look only at what the law is, and not at the effect of the law, and whether the Constitution has by a series of amendments been changed from a guarantee of the form and permanency of our government, or whether those amendments do change the form of our government, as was argued, are considerations which, while of profound interest to all citizens, nevertheless cannot affect our judgment as to the validity of the amendment. Whether a thing is wise or unwise is one thing, whether it is unlawful is another. The determination of the first question is for the legislature and of the second for the courts. We have re-stated these principles, which have been so frequently laid down by this Court, because we are asked in this case, in effect, to assume and

exercise a power essentially legislative in character, and to go beyond the letter of the amending clause of the Constitution, and to read into it an implied prohibition limiting and restricting its application.

We will now turn to the main question and that is, whether the Nineteenth Amendment to the Constitution was validly adopted and ratified. The appellants contend that it was not, and in support of that contention they submit two propositions,—one, that it was not within the amending power of the Constitution, and the other that, if it is within such power, it was not ratified by the requisite number of states.

In dealing with the first of these propositions, we are met at the threshold of our inquiry by the fact that the Supreme Court has in effect passed upon the proposition and has found it untenable and unsound, and whatever may be the powers of that court in regard to correcting and overruling its own decisions relating to the construction or the interpretation of the Constitution of the United States, manifestly this Court is without any such power, but on the contrary it must recognize the binding force of such decisions and be controlled by them.

The Fifteenth Amendment provides that, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude." It was proposed to the legislatures of the several states on February 27, 1869, and was declared, on March 30, 1870, to have been ratified by twenty-nine of the thirty-seven states.

The Nineteenth Amendment provides that, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of sex," and was on August 26, 1920, declared to have been ratified by thirty-six of the forty-eight states. The only difference between the two amendments is that, while the Fifteenth Amendment prohibits discrimination by the states or the nation against citizens in regard to suffrage on account

of "race, color or previous condition of servitude," the Nineteenth Amendment forbids such discrimination on account of "sex." In other words, it but adds the word "sex" to the words "race, color or previous condition of servitude," occurring in the clause of the Fifteenth Amendment which forbids discrimination against certain classes of citizens in regard to their right to vote, and thus brings another class of citizens within the reach of the prohibition against discrimination on the part of the states or of the United States in conferring the right of suffrage.

If, therefore, the Fifteenth Amendment was a valid exercise of the amending power, it is impossible to conceive that the Nineteenth Amendment was not likewise a valid exercise of that power, because it is not possible to distinguish the two in principle.

But the Fifteenth Amendment has been repeatedly recognized by the Supreme Court as within the amending power and treated as an integral part of the Constitution. In *U. S.* v. *Reese,* 92 U. S. 214, in which two election officials were indicted for refusing to receive and count the vote of a citizen of the United States of African descent at a municipal election, that Court in 1875 said: "The Fifteenth Amendment does not confer the right of suffrage upon anyone. It prevents the states, or the United States, however, from giving preference, in this particular, to one citizen of the United States over another, on account of race, color or previous condition of servitude. Before its adoption this could be done. It was as much within the power of a state to exclude citizens of the United States from voting on account of race, etc., as it was on account of age, property or education. Now it is not. If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be. Previous to this amendment, there was no constitutional guaranty against this discrimination; now there is. It follows that the amendment has invested the citizens of the United States

with a new constitutional right which is within the protecting power of Congress.    That right is exemption from discrimination in the exercise of the elective franchise on account of race, color or previous condition of servitude." And in *Neal* v. *Delaware,* 103 U. S. 370 (1881), a case in which a colored man, indicted in the State of Delaware for a crime punishable by death, sought to have his case removed to a Federal court on the ground that, as the Constitution of Delaware restricted the right of suffrage to "white" male citizens, and that as the members of the grand jury which indicted him and the petit jury which had been summoned to try him were in practice taken from the list of voters, and that as under the Constitution of Delaware the names of colored citizens were not included in that list, none appeared on the panels of the grand or petit juries, and that he was in consequence deprived of the equal protection of the law, in dealing with that question the Court said: "Beyond question the adoption of the Fifteenth Amendment had the effect, in law, to remove from the state constitution or render inoperative that provision which restricts the right of suffrage to the white race.    Thenceforward, the statute which prescribed the qualifications of jurors was, itself, enlarged in its operation, so as to embrace all who by the state constitution, as modified by the supreme law of the land, were qualified to vote at a general election.    The presumption should be indulged, in the first instance, that the State recognizes, as is its plain duty, an amendment of the Federal Constitution, from the time of its adoption, as binding on all of its citizens and every department of its government, and to be enforced, within its limits, without reference to any inconsistent provisions in its own constitution or statutes. In this case that presumption is strengthened and, indeed, becomes conclusive, not only by the direct adjudication of the state court as to what is the fundamental law of Delaware, but by the entire absence of any statutory enactments or any adjudication, since the adoption of the Fifteenth

Amendment, indicating that the state, by its constituted
authorities, does not recognize, in the fullest legal sense,
the binding force of that amendment and its effect in modi-
fying the state constitution upon the subject of suffrage."
And later, in 1915, in *Guinn* v. *United States,* 238 U. S.
347, in which the question of negro suffrage was before the
Court, in speaking of the effect of the Fifteenth Amendment,
through the late CHIEF JUSTICE WHITE, it said:

"(*a*) Beyond doubt the amendment does not take away
from the state governments in a general sense the power over
suffrage which has belonged to those governments from the
beginning, and without the possession of which power the
whole fabric upon which the division of state and national
authority under the Constitution and the organization of
both governments rest would be without support, and both the
authority of the nation and the state would fall to the ground.
In fact, the very command of the amendment recognizes the
possession of the general power by the state, since the amend-
ment seeks to regulate its exercise as to the particular sub-
ject with which it deals.

"(*b*) But it is equally beyond the possibility of question
that the amendment in express terms restricts the power of
the United States or the states to abridge or deny the right
of a citizen of the United States to vote on account of race,
color or previous condition of servitude. The restriction is
coincident with the power and prevents its exertion in dis-
regard to the command of the amendment. But while this
is true, it is true also that the amendment does not change,
modify or deprive the states of their full power as to suf-
frage, except, of course, as to the subject with which the
amendment deals and to the extent that obedience to its
command is necessary. Thus the authority over suffrage
which the states possess and the limitation which the amend-
ment imposes are co-ordinate, and one may not destroy the
other without bringing about the destruction of both."

And in *Myers* v. *Anderson,* 238 U. S. 368, in which the question presented was the liability of election officers for denying suffrage to negro citizens in violation of the guaranties of the Fifteenth Amendment and of certain statutes of the United States enacted for the purpose of insuring the protection offered by the amendment, the Court said: "The qualification of voters under the Constitution of Maryland existed and the statute which previously provided for the registration and election in Annapolis was unaffected by the void provisions of the statute which we are considering. The mere change in some respects of the administrative machinery by the new statute did not relieve the new officers of their duty, nor did it interpose a shield to prevent the operation upon them of the provisions of the Constitution of the United States and the statutes passed in pursuance thereof. The conclusive effect of this view will become apparent when it is considered that if the argument were accepted, it would follow that although the Fifteenth Amendment by its self-operative force, without any action of the State, changed the clause in the Constitution of the State of Maryland conferring suffrage upon 'every white male citizen' so as to cause it to read 'every male citizen,' nevertheless the amendment was so supine, so devoid of effect, as to leave it open for the legislature to write back by statute the discriminating provision by a mere changed form of expression into the laws of the State, and for the State officers to make the result of such action successfully operative."

In view of these decisions, the right of the Congress of the United States to propose amendments to the Constitution thereof forbidding the United States and the several states from discriminating against any class of its citizens in regard to their rights to vote cannot now be called in question, but must be regarded as finally settled. Nor could any useful end be served by commenting in this opinion upon the reasons or the absence of reasons for those decisions.

They have been made and now stand as a part of the law of the land and we at least are bound by them.

It was contended that the Fifteenth Amendment was a "war" amendment, adopted at a time when men's passions and prejudices were aroused, and when restraints or limitations of any kind were irksome and intolerable, and when the people were impatient and intolerant of anything that stood in the way of their will, and were unwilling to be shackled or hindered in the execution of their plans by mere constitutional limitations, and that therefore the adoption of this amendment should not be accepted as a precedent, nor the decisions recognizing its validity accepted as conclusive of this case for that reason, and for the further reason that the Fifteenth Amendment had been acquiesced in for so long that such acquiescence was in itself equivalent to an express ratification by the states.

But we cannot, in the face of the direct language of the Constitution describing the manner in which it may be amended, recognize the doctrine of amendment by acquiescence as a valid substitute for that method. Nor can we assume, no matter what the state of the public mind may have been, that the Court charged with the duty of guarding and supporting the Constitution, tacitly ratified its violation, but we must on the contrary assume that, when it recognized the validity of the amendment, it did so in the belief that it was within the amending power of the Constitution.

Nor can we assume, because the Court did not, in the cases to which we have referred, specifically discuss the extent of the amending power of the Constitution as affecting the validity of the Fifteenth Amendment, but assumed without assigning reasons for its conclusion that the amendment was valid, that it did not consider every question involved in its conclusion. Nor can it be assumed that it permitted its conclusions to rest upon the authority of an amendment which was proposed, adopted and ratified in violation of the Constitution, whether that question was or was not directly

put in issue by the pleadings or the arguments in the case. And when, therefore, in the cases cited, it based its decisions upon the assumption that the Fifteenth Amendment is a valid amendment, we are bound by those decisions to assume that it is a valid amendment, and within the amending power, for there can be no other conclusion. The only power of amending the Constitution is that furnished by itself. Unless any amendment, the validity of which is questioned, can be brought within that power, it must fall. When, therefore, the validity of an amendment is upheld by competent authority, it can only be upon the theory that it is within the amending power of the Constitution, and, when the Supreme Court assumed the validity of the Fifteenth Amendment, it necessarily decided that it was within the amending power. And as the Nineteenth Amendment cannot be distinguished in principle from the Fifteenth Amendment, it follows that it is within the amending power.

In view of this conclusion, it becomes unnecessary to consider further the contrary contention, which was presented with so much force and sincerity in this Court.

Whilst the arguments supporting that contention might have great weight if the question were an open one, yet, in view of the decisions of the Supreme Court, it must be regarded as finally closed.

This brings us to the second proposition, which is that the amendment was not ratified by thirty-six States.

Mr. Bainbridge Colby, the Secretary of State, on August 26th, proclaimed that the Nineteenth Amendment had been ratified by thirty-six States, including the States of Missouri, Tennessee and West Virginia. The petitioners, however, contended that it never was validly ratified by the States of Missouri, Tennessee or West Virginia, first, because under the Constitutions of Missouri and Tennessee, the Legislatures which ratified the amendment were without any power or authority to do so, and second, that the action of the Legislatures of Tennessee and West Virginia in ratifying the amend-

ment was in violation of their own rules of procedure and of the respective constitutions of those states.

The first reason rests upon the following provisions of the constitutions respectively of the States of Missouri and Tennessee:

*Constitution of Missouri,* Article 2, Section 3: . "Local self-government not to be impaired. That Missouri is a free and independent state, subject only to the Constitution of the United States; and as the preservation of the states and the maintenance of their governments are necessary to an indestructible union, and were intended to co-exist with it, the Legislature is not authorized to adopt, nor will the people of this state ever assent to any amendment or change of the Constitution of the United States which may in anywise impair the right of local self-government belonging to the people of this state."

*Constitution of Tennessee,* Article 2, Section 32: "Amendments to Constitution of the United States: No convention or general assembly of this state shall act upon any amendment of the Constitution of the United States proposed by Congress to the several states; unless such convention or general assembly shall have been elected after such amendment is submitted."

It being conceded that the Legislature of Tennessee which ratified the amendment was elected before it was proposed, the question is whether these constitutional provisions are valid limitations upon the amending power created by the Fifth Article of the Constitution of the United States.

Here again the question which we are called upon to consider has already been answered by the highest court authorized to deal with the matter, which has decided that the people of any one of the several states cannot impose any limitations upon the amending power of the Constitution, and in our opinion the conclusion there reached was in obvious accord with the purpose and intent of the Fifth Article. That article provides that an amendment of the Constitution, when

proposed by two-thirds of the members of each branch of the Congress of the United States, shall be adopted whenever ratified by the legislatures or conventions called to consider the question of three-fourths of the states. If, however, the people of the several states could by state constitutions take away or limit the rights of such legislatures or conventions to so ratify a proposed amendment to the Constitution, then they could by the exercise of that power nullify and destroy the power of amendment conferred by the Fifth Article, which is a part of the Constitution, and so could by such action amend it in one of its most important and vital elements in a manner not provided by it. Such a conclusion ignores the fundamental distinction between the rights and privileges of the people of the United States in the enactment of legislation in the respective states of which they may be citizens in respect to matters peculiar to the local government of such states, and their rights and privileges when dealing with legislation affecting the people of all the states. The power in the one case is derived from the people of the state, and is an inherent attribute of its sovereignty, while in the other it is drawn from the Federal Constitution. The power of the people of the United States in their relation to it is limited and defined by the express grants of the Constitution, while their power in their relation to governments of the states of which they are citizens is the residuum which is found, after subtracting the powers granted in the Federal Constitution by the people of the state to the Federal Government, from the sum of the powers possessed by the people of the state in their collective character as a sovereign state. The right to amend the laws and constitutions of the several states possessed by the people thereof is natural and inherent and is incident to the sovereignty of the states, but the right to amend the Constitution of the United States rests solely upon the provisions of the Constitution of the United States. ·

Having granted the power to amend that constitution to the people of all the states, manifestly the people of the sev-

eral states cannot, acting separately, exercise the very power they have granted away.

This conclusion is in accord with the decisions in the two cases of *Hawke* v. *Smith, No.* 1, 253 U. S. 221, and *Hawke* v. *Smith, No.* 2, *Ibid.* 231, both of which dealt with the validity of a provision of the Ohio constitution extending the referendum to the ratification by the general assembly of that state of proposed amendments of the Federal Constitution. In dealing with that question the Court, in the case first cited, which related to the reference of the action of the general assembly in ratifying the Eighteenth Amendment to the people of Ohio under the provision of the state constitution referred to, said: "The framers of the constitution realized that it might in the progress of time and the development of new conditions require changes, and they intended to provide an orderly manner in which these could be accomplished; to that end they adopted the Fifth Article. * * * The Fifth Article is a grant of authority by the people to Congress. The determination of the method of ratification is the exercise of a national power specifically granted by the constitution; that power is conferred upon Congress, and is limited to two methods, by action of the legislatures of three-fourths of the states, or conventions in a like number of states. *Dodge* v. *Woolsey,* 18 How. 331, 348. The framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people, or to some authority of government other than that selected. The language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed."

In *Hawke* v. *Smith, No.* 2, *supra,* in which the same question was presented, except that the amendment involved there was the Nineteenth Amendment, the Court reached the same conclusion.

And in the *National Prohibition Cases,* 253 U. S. 386, the Court again said: "The referendum provisions of state con-

stitutions and statutes cannot be applied consistently with the Constitution of the United States in the ratification or rejection of amendments to it."

The facts upon which the contention that the amendment was not ratified by the legislatures of West Virginia and Tennessee is based are substantially these:

The Governor of West Virginia convened the legislature of that state in extra session on February 27, 1920. On the same day a joint resolution ratifying the proposed Nineteenth Amendment was offered in the senate. On March 1st, 1920, this resolution was defeated, and on March 3rd a motion to reconsider that action was lost. But on March 8th the senate received a message from the house announcing the passage by that body of the resolution. Objection was made to the further consideration of the resolution on the ground that the question, having once been acted upon and disposed of, and the action disposing of it reconsidered and affirmed, it could not again be considered by the senate, under Rule 52 of that body, which reads as follows: "52. The question being once determined, must stand as the judgment of the Senate, and cannot during the session be drawn again into the debate unless reconsidered, and it shall be in order for any member voting with the prevailing side to move a reconsideration of the same within two succeeding days." Notwithstanding the objection the resolution passed the senate on March 10th, 1920, and the action of the legislature was certified to the Department of State.

In Tennessee the legislature was also convened by the Governor in extra session. It met on August 9th, 1920, and on August 10th a joint resolution ratifying the proposed Nineteenth Amendment was offered in the senate, passed by it on August 13th, 1920, and sent to the house, which on August 18th, 1920, concurred in the action of the senate. On the same day a motion was made to reconsider the action of the house in concurring. On August 21st, there was a motion to call from the journal the motion to reconsider, but it was de-

clared out of order by the speaker on the ground that a quorum of the members of the house was not present. Although this ruling was supported by the roll call, it was overruled by a majority of those present, and the motion to reconsider voted on and lost. On August 31st, the absentees having returned, the proceedings under which the motion to reconsider had been defeated were expunged from the journal, and the motion adopted; and the house then passed a motion to non concur in the action of the senate ratifying the amendment. In the meantime, and before this action had been taken, the Governor of Tennessee had on August 24th certified to the Federal Government that the amendment had been ratified by the general assembly of the State of Tennessee. No particular difficulty is presented by the appellants' contention in regard to the action of the legislature of West Virginia, even if we assume, which we do not, that the ratification of an amendent to the Federal Constitution is "legislation" within the meaning of the rules of the Senate of that state governing its procedure in dealing with legislation before it. There is nothing in the general language of the rule in question to withdraw it from the effect of the principle that such rules only operate to prevent members of the house in which the measure upon which it has once acted originated, from again bringing the subject before it, but that they do not prevent the consideration of the same subject matter when embodied in a bill or resolution coming from the other house. *Cushing, Law & Practice of Legislative Assemblies,* p. 296. Nor can we agree that the two resolutions offered respectively in the House and Senate were one measure, nor does the case of *Smith* v. *Mitchell,* 69 W. Va. 481, support that contention. The facts of that case were these: A bill had been read three times in the house of delegates and sent to the senate, where it was substituted for a bill identical with it in text, which had been read there on two different days, and the substituted bill was then read on another day in the senate and passed. On objection that it was not read in the senate on three different

days, it was held, not that the two measures were one, but that as they were identical in their text, and that as the identical text had been read on three different days in the senate, that the object and purpose of the provision requiring three readings was gratified. That is a different thing from holding that the act of one branch of the general assembly will not be acted upon by the other because it has once acted on the same subject matter, or that two bills originating in different houses together constitute one measure.

Inasmuch as it appears that in addition to the thirty-six states already referred to as having ratified the Nineteenth Amendment, the State of Connecticut has also ratified it, it becomes unnecessary to consider at length the effect of the action of the legislature of Tennessee in regard to it. In dealing with the question before it, the legislature was not bound by its rules or by its laws relating to legislation, because the ratification of an amendment to the Federal Constitution is "not an act of legislation within the proper sense of the word" (*Hawke v. Smith, No.* 1, *supra*), and while it was essential that the ratification be approved by a majority of a quorum of each branch of the general assembly, in this case that requirement was met, and it was not until that approval had once been given, that the attempt which resulted in so much confusion was made to recall it.

In view of the conclusion we have stated, it is apparent that in our opinion no useful purpose could have been served by granting any of the appellant's prayers and, without pausing to discuss further the propositions they submit, it is sufficient to say that we have discovered no reversible error in the court's rulings in regard to them.

For the reasons stated the order appealed from will be affirmed.

*Order affirmed, with costs.*