COLEMAN ET AL. *v.* MILLER, SECRETARY OF THE SENATE OF THE STATE OF KANSAS, ET AL.

No. 7.   Argued October 10, 1938.   Reargued April 17, 18, 1939.—
Decided June 5, 1939.

434

*Messrs. Robert Stone* and *Rolla W. Coleman,* on the reargument and on the original argument, for petitioners.

*Mr. Clarence V. Beck* on the reargument, and with *Mr. E. R. Sloan* on the original argument, for respondents.

By special leave of Court, *Solicitor General Jackson,* with whom *Mr. Paul A. Freund* was on the brief, argued the case on behalf of the United States, as *amicus curiae,* urging affirmance.

By leave of Court, *Messrs. Orland S. Loomis,* Attorney General of Wisconsin, *Mortimer Levitan* and *Newell S. Boardman,* Assistant Attorneys General, filed a brief on behalf of that State, as *amicus curiae,* urging affirmance.

Opinion of the Court by MR. CHIEF JUSTICE HUGHES, announced by MR. JUSTICE STONE.

In June, 1924, the Congress proposed an amendment to the Constitution, known as the Child Labor Amendment.[1] In January, 1925, the Legislature of Kansas adopted a resolution rejecting the proposed amendment and a certified copy of the resolution was sent to the Secretary of State of the United States. In January, 1937, a resolution known as "Senate Concurrent Resolu-

---

[1] The text of the proposed amendment is as follows (43 Stat. 670):

"Section 1. The Congress shall have power to limit, regulate, and prohibit the labor of persons under eighteen years of age.

"Sec. 2. The power of the several States is unimpaired by this article except that the operation of State laws shall be suspended to the extent necessary to give effect to legislation enacted by the Congress."

tion No. 3" was introduced in the Senate of Kansas ratifying the proposed amendment. There were forty senators. When the resolution came up for consideration, twenty senators voted in favor of its adoption and twenty voted against it. The Lieutenant Governor, the presiding officer of the Senate, then cast his vote in favor of the resolution. The resolution was later adopted by the House of Representatives on the vote of a majority of its members.

This original proceeding in mandamus was then brought in the Supreme Court of Kansas by twenty-one members of the Senate, including the twenty senators who had voted against the resolution, and three members of the House of Representatives, to compel the Secretary of the Senate to erase an endorsement on the resolution to the effect that it had been adopted by the Senate and to endorse thereon the words "was not passed," and to restrain the officers of the Senate and House of Representatives from signing the resolution and the Secretary of State of Kansas from authenticating it and delivering it to the Governor. The petition challenged the right of the Lieutenant Governor to cast the deciding vote in the Senate. The petition also set forth the prior rejection of the proposed amendment and alleged that in the period from June, 1924, to March, 1927, the amendment had been rejected by both houses of the legislatures of twenty-six States, and had been ratified in only five States, and that by reason of that rejection and the failure of ratification within a reasonable time the proposed amendment had lost its vitality.

An alternative writ was issued. Later the Senate passed a resolution directing the Attorney General to enter the appearance of the State and to represent the State as its interests might appear. Answers were filed

on behalf of the defendants other than the State and plaintiffs made their reply.

The Supreme Court found no dispute as to the facts. The court entertained the action and held that the Lieutenant Governor was authorized to cast the deciding vote, that the proposed amendment retained its original vitality, and that the resolution "having duly passed the house of representatives and the senate, the act of ratification of the proposed amendment by the legislature of Kansas was final and complete." The writ of mandamus was accordingly denied. 146 Kan. 390; 71 P. 2d 518. This Court granted certiorari. 303 U. S. 632.

*First. The jurisdiction of this Court.*—Our authority to issue the writ of certiorari is challenged upon the ground that petitioners have no standing to seek to have the judgment of the state court reviewed, and hence it is urged that the writ of certiorari should be dismissed. We are unable to accept that view.

The state court held that it had jurisdiction; that "the right of the parties to maintain the action is beyond question." [2] The state court thus determined in substance that members of the legislature had standing to seek, and the court had jurisdiction to grant, mandamus to compel a proper record of legislative action. Had the questions been solely state questions, the matter would

---

[2] The state court said on this point:

"At the threshold we are confronted with the question raised by the defendants as to the right of the plaintiffs to maintain this action. It appears that on March 30, 1937, the state senate adopted a resolution directing the attorney general to appear for the state of Kansas in this action. It further appears that on April 3, 1937, on application of the attorney general, an order was entered making the state of Kansas a party defendant. The state being a party to the proceedings, we think the right of the parties to maintain the action is beyond question. (G. S. 1935, 75–702; *State, ex rel.* v. *Public Service Comn.*, 135 Kan. 491, 11 P. 2d 999.)"

have ended there. But the questions raised in the instant case arose under the Federal Constitution and these questions were entertained and decided by the state court. They arose under Article V of the Constitution which alone conferred the power to amend and determined the manner in which that power could be exercised. *Hawke* v. *Smith* (*No. 1*), 253 U. S. 221, 227; *Leser* v. *Garnett*, 258 U. S. 130, 137. Whether any or all of the questions thus raised and decided are deemed to be justiciable or political, they are exclusively federal questions and not state questions.

We find the cases cited in support of the contention, that petitioners lack an adequate interest to invoke our jurisdiction to review, to be inapplicable.[3] Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege. As the validity of a state statute was not assailed, the remedy by appeal was not available (Jud. Code, § 237 (a); 28 U. S. C. 344 (a)) and the appropriate remedy was by writ of certiorari which we granted. Jud. Code, § 237 (b); 28 U. S. C. 344 (b).

The contention to the contrary is answered by our decisions in *Hawke* v. *Smith, supra,* and *Leser* v. *Garnett,*

---

[3] See *Caffrey* v. *Oklahoma Territory*, 177 U. S. 346; *Smith* v. *Indiana*, 191 U. S. 138; *Braxton County Court* v. *West Virginia*, 208 U. S. 192; *Marshall* v. *Dye*, 231 U. S. 250; *Stewart* v. *Kansas City*, 239 U. S. 14; *Columbus & Greenville Ry. Co.* v. *Miller*, 283 U. S. 96.

*supra.* In *Hawke* v. *Smith,* the plaintiff in error, suing as a "citizen and elector of the State of Ohio, and as a taxpayer and elector of the County of Hamilton," on behalf of himself and others similarly situated, filed a petition for an injunction in the state court to restrain the Secretary of State from spending the public money in preparing and printing ballots for submission of a referendum to the electors on the question of the ratification of the Eighteenth Amendment to the Federal Constitution. A demurrer to the petition was sustained in the lower court and its judgment was affirmed by the intermediate appellate court and the Supreme Court of the State. This Court entertained jurisdiction and, holding that the state court had erred in deciding that the State had authority to require the submission of the ratification to a referendum, reversed the judgment.

In *Leser* v. *Garnett,* qualified voters in the State of Maryland brought suit in the state court to have the names of certain women stricken from the list of qualified voters on the ground that the constitution of Maryland limited suffrage to men and that the Nineteenth Amendment to the Federal Constitution has not been validly ratified. The state court took jurisdiction and the Court of Appeals of the State affirmed the judgment dismissing the petition. We granted certiorari. On the question of our jurisdiction we said:

"The petitioners contended, on several grounds, that the Amendment had not become part of the Federal Constitution. The trial court overruled the contentions and dismissed the petition. Its judgment was affirmed by the Court of Appeals of the State, 139 Md. 46; and the case comes here on writ of error. That writ must be dismissed; but the petition for a writ of certiorari, also duly filed, is granted. The laws of Maryland authorized such a suit by a qualified voter against the Board of Registry. Whether the Nineteenth Amendment has be-

440

come part of the Federal Constitution is the question presented for decision."

And holding that the official notice to the Secretary of State, duly authenticated, of the action of the legislatures of the States, whose alleged ratifications were assailed, was conclusive upon the Secretary of State and that his proclamation accordingly of ratification was conclusive upon the courts, we affirmed the judgment of the state court.

That the question of our jurisdiction in *Leser* v. *Garnett* was decided upon deliberate consideration is sufficiently shown by the fact that there was a motion to dismiss the writ of error for the want of jurisdiction and opposition to the grant of certiorari. The decision is the more striking because on the same day, in an opinion immediately preceding which was prepared for the Court by the same Justice,[4] jurisdiction had been denied to a federal court (the Supreme Court of the District of Columbia) of a suit by citizens of the United States, taxpayers and members of a voluntary association organized to support the Constitution, in which it was sought to have the Nineteenth Amendment declared unconstitutional and to enjoin the Secretary of State from proclaiming its ratification and the Attorney General from taking steps to enforce it. *Fairchild* v. *Hughes*, 258 U. S. 126. The Court held that the plaintiffs' alleged interest in the question submitted was not such as to afford a basis for the proceeding; that the plaintiffs had only the right possessed by every citizen "to require that the Government be administered according to law and that the public moneys be not wasted" and that this general right did not entitle a private citizen to bring such a suit as the one in question in the federal courts.[5] It

---

[4] Mr. Justice Brandeis.

[5] *Id.*, pp. 129, 130. See, also, *Frothingham* v. *Mellon*, 262 U. S. 447, 480, 486, 487.

would be difficult to imagine a situation in which the adequacy of the petitioners' interest to invoke our appellate jurisdiction in *Leser* v. *Garnett* could have been more sharply presented.

The effort to distinguish that case on the ground that the plaintiffs were qualified voters in Maryland, and hence could complain of the admission to the registry of those alleged not to be qualified, is futile. The interest of the plaintiffs in *Leser* v. *Garnett* as merely qualified voters at general elections is certainly much less impressive than the interest of the twenty senators in the instant case. This is not a mere intra-parliamentary controversy but the question relates to legislative action deriving its force solely from the provisions of the Federal Constitution, and the twenty senators were not only qualified to vote on the question of ratification but their votes, if the Lieutenant Governor were excluded as not being a part of the legislature for that purpose, would have been decisive in defeating the ratifying resolution.

We are of the opinion that *Hawke* v. *Smith* and *Leser* v. *Garnett* are controlling authorities, but in view of the wide range the discussion has taken we may refer to some other instances in which the question of what constitutes a sufficient interest to enable one to invoke our appellate jurisdiction has been involved. The principle that the applicant must show a legal interest in the controversy has been maintained. It has been applied repeatedly in cases where municipal corporations have challenged state legislation affecting their alleged rights and obligations. Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator.[6] But there

---

[6] *Pawhuska* v. *Pawhuska Oil Co.*, 250 U. S. 394; *Trenton* v. *New Jersey*, 262 U. S. 182; *Risty* v. *Chicago, R. I. & P. Ry. Co.*, 270 U. S. 378; *Williams* v. *Mayor*, 289 U. S. 36.

has been recognition of the legitimate interest of public officials and administrative commissions, federal and state, to resist the endeavor to prevent the enforcement of statutes in relation to which they have official duties. Under the Urgent Deficiencies Act,[7] the Interstate Commerce Commission, and commissions representing interested States which have intervened, are entitled as "aggrieved parties" to an appeal to this Court from a decree setting aside an order of the Interstate Commerce Commission, though the United States refuses to join in the appeal. *Interstate Commerce Comm'n* v. *Oregon-Washington R. & N. Co.*, 288 U. S. 14. So, this Court may grant certiorari, on the application of the Federal Trade Commission, to review decisions setting aside its orders.[8] *Federal Trade Comm'n* v. *Curtis Publishing Co.*, 260 U. S. 568. Analogous provisions authorize certiorari to review decisions against the National Labor Relations Board.[9] *National Labor Relations Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1. Under § 266 of the Judicial Code (28 U. S. C. 380), where an injunction is sought to restrain the enforcement of a statute of a State or an order of its administrative board or commission, upon the ground of invalidity under the Federal Constitution, the right of direct appeal to this Court from the decree of the required three judges is accorded whether the injunction be granted or denied. Hence, in case the injunction is granted, the state board is entitled to appeal. See, for example, *South Carolina Highway Dept.* v. *Barnwell Brothers*, 303 U. S. 177.

The question of our authority to grant certiorari, on the application of state officers, to review decisions of state courts declaring state statutes, which these officers

---

[7] Act of October 22, 1913, 38 Stat. 219; 28 U. S. C. 47, 47a, 345.

[8] 15 U. S. C. 45; 28 U. S. C. 348.

[9] 29 U. S. C. 160 (e). See, also, as to orders of Federal Communications Commission, 47 U. S. C. 402 (e).

seek to enforce, to be repugnant to the Federal Constitution, has been carefully considered and our jurisdiction in that class of cases has been sustained. The original Judiciary Act of 1789 provided in § 25 [10] for the review by this Court of a judgment of a state court "where is drawn in question the validity of a statute of, or an authority exercised under any State, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity"; that is, where the claim of federal right had been *denied*. By the Act of December 23, 1914,[11] it was provided that this Court may review on certiorari decisions of state courts *sustaining* a federal right. The present statute governing our jurisdiction on certiorari contains the corresponding provision that this Court may exercise that jurisdiction "as well where the federal claim is sustained as where it is denied." Jud. Code, § 237 (b); 28 U. S. C. 344 (b). The plain purpose was to provide an opportunity, deemed to be important and appropriate, for the review of the decisions of state courts on constitutional questions however the state court might decide them. Accordingly where the claim of a complainant that a state officer be restrained from enforcing a state statute because of constitutional invalidity is sustained by the state court, the statute enables the state officer to seek a reversal by this Court of that decision.

In *Blodgett* v. *Silberman,* 277 U. S. 1, 7, the Court granted certiorari on the application of the State Tax Commissioner of Connecticut who sought review of the decision of the Supreme Court of Errors of the State so far as it denied the right created by its statute to tax the transfer of certain securities, which had been placed for safekeeping in New York, on the ground that they

---

[10] 1 Stat. 73, 85, 86.

[11] 38 Stat. 790; see, also, Act of September 6, 1916, 39 Stat. 726.

were not within the taxing jurisdiction of Connecticut. Entertaining jurisdiction, this Court reversed the judgment in that respect. *Id.*, p. 18.

The question received most careful consideration in the case of *Boynton* v. *Hutchinson Gas Co.*, 291 U. S. 656, where the Supreme Court of Kansas had held a state statute to be repugnant to the Federal Constitution, and the Attorney General of the State applied for certiorari. His application was opposed upon the ground that he had merely an official interest in the controversy and the decisions were invoked upon which the Government relies in challenging our jurisdiction in the instant case.[12] Because of its importance, and contrary to our usual practice, the Court directed oral argument on the question whether certiorari should be granted, and after that argument, upon mature deliberation, granted the writ. The writ was subsequently dismissed but only because of a failure of the record to show service of summons and severance upon the appellees in the state court who were not parties to the proceedings here. 292 U. S. 601. This decision with respect to the scope of our jurisdiction has been followed in later cases. In *Morehead* v. *New York ex rel. Tipaldo,* 298 U. S. 587, we granted certiorari on an application by the warden of a city prison to review the decision of the Court of Appeals of the State on *habeas corpus,* ruling that the minimum wage law of the State violated the Federal Constitution. This Court decided the case on the merits. In *Kelly* v. *Washington ex rel. Foss Co.,* 302 U. S. 1, we granted certiorari, on the application of the state authorities charged with the enforcement of the state law relating to the inspection and regulation of vessels, to review the decision of the state court holding the statute invalid in its application to navigable waters. We concluded that the state act had a permissible field of operation and the decision of the

---

[12] See cases cited in Note 3.

state court in holding the statute completely unenforceable in deference to federal law was. reversed.

This class of cases in which we have exercised our appellate jurisdiction on the application of state officers. may be said to recognize that they have an adequate interest in the controversy by reason of their duty to enforce the state statutes the validity of which has been drawn in question. In none of these cases could it be said that the state officers invoking our jurisdiction were sustaining any "private damage."

While one who asserts the mere right of a citizen and taxpayer of the United States to complain of the alleged invalid outlay of public moneys has no standing to invoke the jurisdiction of the federal courts (*Frothingham* v. *Mellon*, 262 U. S. 447, 480, 486, 487), the Court has sustained the more immediate and substantial right of a resident taxpayer to invoke the interposition of a court of equity to enjoin an illegal use of moneys by a municipal corporation. *Crampton* v. *Zabriskie*, 101 U. S. 601, 609; *Frothingham* v. *Mellon, supra*. In *Heim* v. *McCall*, 239 U. S. 175, we took jurisdiction on a writ of error sued out by a property owner and taxpayer, who had been given standing in the state court, for the purpose of reviewing its decision sustaining the validity under the Federal Constitution, of a state statute as applied to contracts for the construction of public works in the City of New York, the enforcement of which was alleged to involve irreparable loss to the city and hence to be inimical to the interests of the taxpayer.

In *Smiley* v. *Holm*, 285 U. S. 355, we granted certiorari on the application of one who was an "elector," as well as a "citizen" and "taxpayer," and who assailed under the Federal Constitution a state statute establishing congressional districts. Passing upon the merits we held that the function of a state legislature in prescribing the time, place and manner of holding elections for representatives

in Congress under Article I, § 4, was a law-making function in which the veto power of the state governor participates, if under the state constitution the governor has that power in the course of the making of state laws, and accordingly reversed the judgment of the state court. We took jurisdiction on certiorari in a similar case from New York where the petitioners were "citizens and voters of the State" who had sought a mandamus to compel the Secretary of State of New York to certify that representatives in Congress were to be elected in the congressional districts as defined by a concurrent resolution of the Senate and Assembly of the legislature. There the state court, construing the provision of the Federal Constitution as contemplating the exercise of the law-making power, had sustained the defense that the concurrent resolution was ineffective as it had not been submitted to the Governor for approval, and refused the writ of mandamus. We affirmed the judgment. *Koenig* v. *Flynn,* 285 U. S. 375.

In the light of this course of decisions, we find no departure from principle in recognizing in the instant case that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision.

*Second. The participation of the Lieutenant Governor:*—Petitioners contend that, in the light of the powers and duties of the Lieutenant Governor and his relation to the Senate under the state constitution, as construed by the supreme court of the state, the Lieutenant Governor was not a part of the "legislature" so that under Article V of the Federal Constitution, he could be permitted to have a deciding vote on the ratification of the

proposed amendment, when the senate was equally divided.

Whether this contention presents a justiciable controversy, or a question which is political in its nature and hence not justiciable, is a question upon which the Court is equally divided and therefore the Court expresses no opinion upon that point.

*Third. The effect of the previous rejection of the amendment and of the lapse of time since its submission.*

1. The state court adopted the view expressed by text-writers that a state legislature which has rejected an amendment proposed by the Congress may later ratify.[13] The argument in support of that view is that Article V says nothing of rejection but speaks only of ratification and provides that a proposed amendment shall be valid as part of the Constitution when ratified by three-fourths of the States; that the power to ratify is thus conferred upon the State by the Constitution and, as a ratifying power, persists despite a previous rejection. The opposing view proceeds on an assumption that if ratification by "Conventions" were prescribed by the Congress, a convention could not reject and, having adjourned *sine die*, be reassembled and ratify. It is also premised, in accordance with views expressed by text-writers,[14] that ratification if once given cannot afterwards be rescinded and the amendment rejected, and it is urged that the same effect in the exhaustion of the State's power to act should be ascribed to rejection; that a State can act "but once, either bv convention or through its legislature."

---

[13] Jameson on Constitutional Conventions, §§ 576–581; Willoughby on the Constitution, § 329a.

[14] Jameson, *op. cit.*, §§ 582–584; Willoughby, *op. cit.*, § 329a; Ames, "Proposed Amendments to the Constitution," House Doc. No. 353, Pt. 2, 54th Cong., 2d Sess., pp. 299, 300.

Historic instances are cited.. In 1865, the Thirteenth Amendment was rejected by the legislature of New Jersey which subsequently ratified it, but the question did not become important as ratification by the requisite number of States had already been proclaimed.[15] The question did arise in connection with the adoption of the Fourteenth Amendment. The legislatures of Georgia, North Carolina and South Carolina had rejected the amendment in November and December, 1866.[16] New governments were erected in those States (and in others) under the direction of Congress.[17] The new legislatures ratified the amendment, that of North Carolina on July 4, 1868, that of South Carolina on July 9, 1868, and that of Georgia on July 21, 1868.[18] Ohio and New Jersey first ratified and then passed resolutions withdrawing their consent.[19] As there were then thirty-seven States, twenty-eight were needed to constitute the requisite three-fourths. On July 9, 1868, the Congress adopted a resolution requesting the Secretary of State to communicate "a list of the States of the Union whose legislatures have ratified the fourteenth article of amendment," [20] and in Secretary Seward's report attention was called to the action of Ohio and New Jersey.[21] On July 20th Secretary Seward issued a proclamation reciting the ratification by twenty-eight States, including North Carolina, South Carolina, Ohio and New Jersey, and stating that it appeared that Ohio and New Jersey had since passed resolutions withdrawing their consent and that "it is

[15] 13 Stat. 774, 775; Jameson, op. cit., § 576; Ames, op. cit., p. 300.
[16] 15 Stat. 710.
[17] Act of March 2, 1867, 14 Stat., p. 428. See White v. Hart, 13 Wall. 646, 652.
[18] 15 Stat. 710.
[19] 15 Stat. 707.
[20] Cong. Globe, 40th Cong., 2d Sess., p. 3857.
[21] Cong. Globe, 40th Cong., 2d Sess., p. 4070.

deemed a matter of doubt and uncertainty whether such resolutions are not irregular, invalid and therefore ineffectual." The Secretary certified that if the ratifying resolutions of Ohio and New Jersey were still in full force and effect, notwithstanding the attempted withdrawal, the amendment had become a part of the Constitution.[22] On the following day the Congress adopted a concurrent resolution which, reciting that three-fourths of the States having ratified (the list including North Carolina, South Carolina, Ohio and New Jersey),[23] declared the Fourteenth Amendment to be a part of the Constitution and that it should be duly promulgated as such by the Secretary of State. Accordingly, Secretary Seward, on July 28th, issued his proclamation embracing the States mentioned in the congressional resolution and adding Georgia.[24]

Thus the political departments of the Government dealt with the effect both of previous rejection and of attempted withdrawal and determined that both were ineffectual in the presence of an actual ratification.[25] While there were special circumstances, because of the action of the Congress in relation to the governments of the rejecting States (North Carolina, South Carolina and Georgia), these circumstances were not recited in proclaiming ratification and the previous action taken in these States was set forth in the proclamation as actual previous rejections by the respective legislatures. This

[22] 15 Stat. 706, 707.

[23] 15 Stat. 709, 710.

[24] 15 Stat. 710, 711; Ames, op. cit., App. No. 1140, p. 377.

[25] The legislature of New York which had ratified the Fifteenth Amendment in 1869 attempted, in January, 1870, to withdraw its ratification, and while this fact was stated in the proclamation by Secretary Fish of the ratification of the amendment, and New York was not needed to make up the required three-fourths, that State was included in the list of ratifying States. 16 Stat. 1131; Ames, op. cit., App. No. 1284, p. 388.

450

decision by the political departments of the Government as to the validity of the adoption of the Fourteenth Amendment has been accepted.

We think that in accordance with this historic precedent the question of the efficacy of ratifications by state legislatures, in the light of previous rejection or attempted withdrawal, should be regarded as a political question pertaining to the political departments, with the ultimate authority in the Congress in the exercise of its control over the promulgation of the adoption of the amendment.

The precise question as now raised is whether, when the legislature of the State, as we have found, has actually ratified the proposed amendment, the Court should restrain the state officers from certifying the ratification to the Secretary of State, because of an earlier rejection, and thus prevent the question from coming before the political departments. We find no basis in either Constitution or statute for such judicial action. Article V, speaking solely of ratification, contains no provision as to rejection.[26] Nor has the Congress enacted a statute relating to rejections. The statutory provision with respect to constitutional amendments is as follows:

"Whenever official notice is received at the Department of State that any amendment proposed to the Constitution of the United States has been adopted, according to the provisions of the Constitution, the Secretary of State shall forthwith cause the amendment to be published, with his certificate, specifying the States by which the same may have been adopted, and that the same has become valid, to all intents and purposes, as a part of the Constitution of the United States."[27]

[26] Compare Article VII.

[27] 5 U. S. C. 160. From Act of April 20, 1818, § 2; 3 Stat. 439; R. S. § 205.

The statute presupposes official notice to the Secretary of State when a state legislature has adopted a resolution of ratification. We see no warrant for judicial interference with the performance of that duty. See *Leser* v. *Garnett, supra,* p. 137.

2. The more serious question is whether the proposal by the Congress of the amendment had lost its vitality through lapse of time and hence it could not be ratified by the Kansas legislature in 1937. The argument of petitioners stresses the fact that nearly thirteen years elapsed between the proposal in 1924 and the ratification in question. It is said that when the amendment was proposed there was a definitely adverse popular sentiment and that at the end of 1925 there had been rejection by both houses of the legislatures of sixteen States and ratification by only four States, and that it was not until about 1933 that an aggressive campaign was started in favor of the amendment. In reply, it is urged that Congress did not fix a limit of time for ratification and that an unreasonably long time had not elapsed since the submission; that the conditions which gave rise to the amendment had not been eliminated; that the prevalence of child labor, the diversity of state laws and the disparity in their administration, with the resulting competitive inequalities, continued to exist. Reference is also made to the fact that a number of the States have treated the amendment as still pending and that in the proceedings of the national government there have been indications of the same view.[28]   It is said that there were fourteen ratifications in 1933, four in 1935, one in 1936, and three in 1937.

---

[28] Sen. Rep. 726, 75th Cong., 1st Sess.; Sen. Rep. 788, 75th Cong., 1st Sess.: Letter of the President on January 8, 1937, to the Governors of nineteen non-ratifying States whose legislatures were to meet in that year, urging them to press for ratification. New York Times, January 9, 1937, p. 5.

452

We have held that the Congress in proposing an amendment may fix a reasonable time for ratification. *Dillon* v. *Gloss,* 256 U. S. 368. There we sustained the action of the Congress in providing in the proposed Eighteenth Amendment that it should be inoperative unless ratified within seven years.[29] No limitation of time for ratification is provided in the instant case either in the proposed amendment or in the resolution of submission. But petitioners contend that, in the absence of a limitation by the Congress, the Court can and should decide what is a reasonable period within which ratification may be had. We are unable to agree with that contention.

It is true that in *Dillon* v. *Gloss* the Court said that nothing was found in Article V which suggested that an amendment once proposed was to be open to ratification for all time, or that ratification in some States might be separated from that in others by many years and yet be effective; that there was a strong suggestion to the contrary in that proposal and ratification were but succeeding steps in a single endeavor; that as amendments were deemed to be prompted by necessity, they should be considered and disposed of presently; and that there is a fair implication that ratification must be sufficiently contemporaneous in the required number of States to reflect the will of the people in all sections at relatively the same period; and hence that ratification must be within some reasonable time after the proposal. These considerations were cogent reasons for the decision in *Dillon* v. *Gloss* that the Congress had the power to fix a reasonable time for ratification. But it does not follow that, whenever Congress has not exercised that power, the Court should take upon itself the responsibility of deciding what con-

---

[29] 40 Stat. 1050. A similar provision was inserted in the Twenty-first Amendment. *United States* v. *Chambers,* 291 U. S. 217, 222.

stitutes a reasonable time and determine accordingly the validity of ratifications. That question was not involved in *Dillon* v. *Gloss* and, in accordance with familiar principle, what was there said must be read in the light of the point decided.

Where are to be found the criteria for such a judicial determination? None are to be found in Constitution or statute. In their endeavor to answer this question petitioners' counsel have suggested that at least two years should be allowed; that six years would not seem to be unreasonably long; that seven years had been used by the Congress as a reasonable period; that one year, six months and thirteen days was the average time used in passing upon amendments which have been ratified since the first ten amendments; that three years, six months and twenty-five days has been the longest time used in ratifying. To this list of variables, counsel add that "the nature and extent of publicity and the activity of the public and of the legislatures of the several States in relation to any particular proposal should be taken into consideration." That statement is pertinent, but there are additional matters to be examined and weighed. When a proposed amendment springs from a conception of economic needs, it would be necessary, in determining whether a reasonable time had elapsed since its submission, to consider the economic conditions prevailing in the country, whether these had so far changed since the submission as to make the proposal no longer responsive to the conception which inspired it or whether conditions were such as to intensify the feeling of need and the appropriateness of the proposed remedial action. In short, the question of a reasonable time in many cases would involve, as in this case it does involve, an appraisal of a great variety of relevant conditions, political, social and economic, which can hardly be said to be within the appropriate range of evidence receivable in a court of justice

and as to which it would be an extravagant extension of judicial authority to assert judicial notice as the basis of deciding a controversy with respect to the validity of an amendment actually ratified. On the other hand, these conditions are appropriate for the consideration of the political departments of the Government. The questions they involve are essentially political and not justiciable. They can be decided by the Congress with the full knowledge and appreciation ascribed to the national legislature of the political, social and economic conditions which have prevailed during the period since the submission of the amendment.

Our decision that the Congress has the power under Article V to fix a reasonable limit of time for ratification in proposing an amendment proceeds upon the assumption that the question, what is a reasonable time, lies within the congressional province. If it be deemed that such a question is an open one when the limit has not been fixed in advance, we think that it should also be regarded as an open one for the consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States, the time arrives for the promulgation of the adoption of the amendment. The decision by the Congress, in its control of the action of the Secretary of State, of the question whether the amendment had been adopted within a reasonable time would not be subject to review by the courts.

It would unduly lengthen this opinion to attempt to review our decisions as to the class of questions deemed to be political and not justiciable. In determining whether a question falls within that category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determina-

tion are dominant considerations.[80]   There are many il-
lustrations in the field of our conduct of foreign relations,
where there are "considerations of policy, considerations
of extreme magnitude, and certainly, entirely incompe-
tent to the examination and decision of a court of jus-
tice." *Ware* v. *Hylton,* 3 Dall. 199, 260.[81]   Questions in-
volving similar considerations are found in the govern-
ment of our internal affairs.   Thus, under Article IV,
§ 4, of the Constitution, providing that the United States
"shall guarantee to every State in this Union a Repub-
lican Form of Government," we have held that it rests
with the Congress to decide what government is the es-
tablished one in a State and whether or not it is repub-
lican in form.   *Luther* v. *Borden,* 7 How. 1, 42.   In that
case Chief Justice Taney observed that "when the sena-
tors and representatives of a State are admitted into the
councils of the Union, the authority of the government
under which they are appointed, as well as its republican
character, is recognized by the proper constitutional au-
thority.   And its decision is binding on every other de-
partment of the government, and could not be questioned
in a judicial tribunal."   So, it was held in the same case
that under the provision of the same Article for the pro-
tection of each of the States "against domestic violence"
it rested with the Congress "to determine upon the means
proper to be adopted to fulfil this guarantee."   *Id.,* p. 43.
So, in *Pacific Telephone Co.* v. *Oregon,* 223 U. S. 118, we
considered that questions arising under the guaranty of

[80] See Willoughby, *op. cit.,* pp. 1326, *et seq.;* Oliver P. Field, "The
Doctrine of Political Questions in the Federal Courts," 8 Minnesota
Law Review, 485; Melville Fuller Weston, "Political Questions," 38
Harvard Law Review, 296.

[81] See, also, *United States* v. *Palmer,* 3 Wheat. 610, 634; *Foster* v.
*Neilson,* 2 Pet. 253, 309; *Doe* v. *Braden,* 16 How. 635, 657; *Terlinden*
v. *Ames,* 184 U. S. 270, 288.

a republican form of government had long since been "definitely determined to be political and governmental" and hence that the question whether the government of Oregon had ceased to be republican in form because of a constitutional amendment by which the people reserved to themselves power to propose and enact laws independently of the legislative assembly and also to approve or reject any act of that body, was a question for the determination of the Congress. It would be finally settled when the Congress admitted the senators and representatives of the State.

For the reasons we have stated, which we think to be as compelling as those which underlay the cited decisions, we think that the Congress in controlling the promulgation of the adoption of a constitutional amendment has the final determination of the question whether by lapse of time its proposal of the amendment had lost its vitality prior to the required ratifications. The state officials should not be restrained from certifying to the Secretary of State the adoption by the legislature of Kansas of the resolution of ratification.

As we find no reason for disturbing the decision of the Supreme Court of Kansas in denying the mandamus sought by petitioners, its judgment is affirmed but upon the grounds stated in this opinion.

*Affirmed.*

Concurring opinion by MR. JUSTICE BLACK, in which MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS join.

Although, for reasons to be stated by MR. JUSTICE FRANKFURTER, we believe this cause should be dismissed, the ruling of the Court just announced removes from the case the question of petitioners' standing to sue. Under the compulsion of that ruling,[1] MR. JUSTICE ROBERTS,

---

[1] Cf., *Helvering* v. *Davis,* 301 U. S. 619, 639–40.

Mr. Justice Frankfurter, Mr. Justice Douglas and I have participated in the discussion of other questions considered by the Court and we concur in the result reached, but for somewhat different reasons.

The Constitution grants Congress exclusive power to control submission of constitutional amendments. Final determination by Congress that ratification by three-fourths of the States has taken place "is conclusive upon the courts." [2] In the exercise of that power, Congress, of course, is governed by the Constitution. However, whether submission, intervening procedure or Congressional determination of ratification conforms to the commands of the Constitution, calls for decisions by a "political department" of questions of a type which this Court has frequently designated "political." And decision of a "political question" by the "political department" to which the Constitution has committed it "conclusively binds the judges, as well as all other officers, citizens and subjects of . . . government." [3] Proclamation under authority of Congress that an amendment has been ratified will carry with it a solemn assurance by the Congress that ratification has taken place as the Constitution commands. Upon this assurance a proclaimed amendment must be accepted as a part of the

---

[2] *Leser* v. *Garnett*, 258 U. S. 130, 137.

[3] *Jones* v. *United States*, 137 U. S. 202, 212; *Foster* v. *Neilson*, 2 Pet. 253, 309, 314; *Luther* v. *Borden*, 7 How. 1, 42; *In re Cooper*, 143 U. S. 472, 503; *Pacific States Telephone Co.* v. *Oregon*, 223 U. S. 118; *Davis* v. *Ohio*, 241 U. S. 565, 569. "And in this view, it is not material to inquire, nor is it the province of the court to determine, whether the executive ["political department"] be right or wrong. It is enough to know that in the exercise of his constitutional functions, he had decided the question. Having done this, under the responsibilities which belong to him, it is obligatory on the people and government of the Union. . . . this court have laid down the rule, that the action of the political branches of the government in a matter that belongs to them, is conclusive." *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415, 420.

458

Constitution, leaving to the judiciary its traditional authority of interpretation.[4] To the extent that the Court's opinion in the present case even impliedly assumes a power to make judicial interpretation of the exclusive constitutional authority of Congress over submission and ratification of amendments, we are unable to agree.

The state court below assumed jurisdiction to determine whether the proper procedure is being followed between submission and final adoption. However, it is apparent that judicial review of or pronouncements upon a supposed limitation of a "reasonable time" within which Congress may accept ratification; as to whether duly authorized state officials have proceeded properly in ratifying or voting for ratification; or whether a State may reverse its action once taken upon a proposed amendment; and kindred questions, are all consistent only with an ultimate control over the amending process in the courts. And this must inevitably embarrass the course of amendment by subjecting to judicial interference matters that we believe were intrusted by the Constitution solely to the political branch of government.

The Court here treats the amending process of the Constitution in some respects as subject to judicial construction, in others as subject to the final authority of the Congress. There is no disapproval of the conclusion arrived at in *Dillon* v. *Gloss*,[5] that the Constitution impliedly requires that a properly submitted amendment must die unless ratified within a "reasonable time." Nor does the Court now disapprove its prior assumption of power to make such a pronouncement. And it is not made clear that only Congress has constitutional power to determine if there is any such implication in Article V of the Constitution. On the other hand, the Court's opinion declares that Congress has the exclusive power to

---

[4] *Field* v. *Clark*, 143 U. S. 649, 672.

[5] 256 U. S. 368, 375.

decide the "political questions" of whether a State whose legislature has once acted upon a proposed amendment may subsequently reverse its position, and whether, in the circumstances of such a case as this, an amendment is dead because an "unreasonable" time has elapsed. No such division between the political and judicial branches of the government is made by Article V which grants power over the amending of the Constitution to Congress alone. Undivided control of that process has been given by the Article exclusively and completely to Congress. The process itself is "political" in its entirety, from submission until an amendment becomes part of the Constitution, and is not subject to judicial guidance, control or interference at any point.

Since Congress has sole and complete control over the amending process, subject to no judicial review, the views of any court upon this process cannot be binding upon Congress, and insofar as *Dillon* v. *Gloss* attempts judicially to impose a limitation upon the right of Congress to determine final adoption of an amendment, it should be disapproved. If Congressional determination that an amendment has been completed and become a part of the Constitution is final and removed from examination by the courts, as the Court's present opinion recognizes, surely the steps leading to that condition must be subject to the scrutiny, control and appraisal of none save the Congress, the body having exclusive power to make that final determination.

Congress, possessing exclusive power over the amending process, cannot be bound by and is under no duty to accept the pronouncements upon that exclusive power by this Court or by the Kansas courts. Neither state nor federal courts can review that power. Therefore, any judicial expression amounting to more than mere acknowledgment of exclusive Congressional power over the political process of amendment is a mere admonition to

the Congress in the nature of an advisory opinion, given wholly without constitutional authority.

Opinion of MR. JUSTICE FRANKFURTER.

It is the view of MR. JUSTICE ROBERTS, MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and myself that the petitioners have no standing in this Court. .

In endowing this Court with "judicial Power" the Constitution presupposed an historic content for that phrase and relied on assumption by the judiciary of authority only over issues which are appropriate for disposition by judges. The Constitution further explicitly indicated the limited àrea within which judicial action was to move— however far-reaching. the consequences of action within that area—by extending "judicial Power" only to "Cases" and "Controversies." Both by what they said and by what they implied, the framers of the Judiciary Article gave merely the outlines of what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union. Judicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted "Cases" or "Controversies." It was not for courts to meddle with matters that required no subtlety to be identified as political issues.[1] And even as to the kinds of questions which were the staple of judicial business, it was not for courts to pass upon them as abstract, intellectual problems but only if a concrete, living contest between adversaries called for the arbitrament of law. Compare *Muskrat* v. *United States,* 219 U. S. 346; *Tutun* v. *United States,* 270 U. S. 568; *Willing* v. *Chi-*

---

[1] For an early instance of the abstention of the King's Justices from matters political, see the Duke of York's Claim to the Crown, House of Lords, 1460, 5 Rot. Parl. 375, reprinted in Wambaugh, Cases on Constitutional Law, 1.

*cago Auditorium Assn.*, 277 U. S. 274; *Nashville, C. & St. L. Ry. Co.* v. *Wallace*, 288 U. S. 249.

As abstractions, these generalities represent common ground among judges. Since, however, considerations governing the exercise of judicial power are not mechanical criteria but derive from conceptions regarding the distribution of governmental powers in their manifold, changing guises, differences in the application of canons of jurisdiction have arisen from the beginning of the Court's history.[2] Conscious or unconscious leanings toward the serviceability of the judicial process in the adjustment of public controversies clothed in the form of private litigation inevitably affect decisions. For they influence awareness in recognizing the relevance of conceded doctrines of judicial self-limitation and rigor in enforcing them.

Of all this, the present controversy furnishes abundant illustration. Twenty-one members of the Kansas Senate and three members of its House of Representatives brought an original mandamus proceeding in the Supreme Court of that State to compel the Secretary of its Senate to erase an endorsement on Kansas "Senate Concurrent Resolution No. 3" of January 1937, to the effect that it had been passed by the Senate, and instead to endorse thereon the words "not passed." They also sought to restrain the officers of both Senate and House from authenticating and delivering it to the Governor of the State for transmission to the Secretary of State of the United States. These Kansas legislators resorted to their Supreme Court claiming that there was no longer an amendment open for ratification by Kansas and that, in any event, it had not been ratified by the "legislature" of

---

[2] See *e. g.* the opinion of Mr. Justice Iredell in *Chisholm* v. *Georgia*, 2 Dall. 419, 429; concurring opinion of Mr. Justice Johnson in *Fletcher* v. *Peck*, 6 Cranch 87, 143; and the cases collected in the concurring opinion of Mr. Justice Brandeis in *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, 341.

Kansas, the constitutional organ for such ratification, See Article V of the Constitution of the United States. The Kansas Supreme Court held that the Kansas legislators had a right to its judgment on these claims, but on the merits decided against them and denied a writ of mandamus. Urging that such denial was in derogation of their rights under the Federal Constitution, the legislators, having been granted *certiorari* to review the Kansas judgment, 303 U. S. 632, ask this Court to reverse it.

Our power to do so is explicitly challenged by the United States as *amicus curiae,* but would in any event have to be faced. See *Mansfield, C. & L. M. Ry. Co.* v. *Swan,* 111 U. S. 379, 382. To whom and for what causes the courts of Kansas are open are matters for Kansas to determine.[3] But Kansas can not define the contours of the authority of the federal courts, and more particularly of this Court. It is our ultimate responsibility to determine who may invoke our judgment and under what circumstances. Are these members of the Kansas legislature, therefore, entitled to ask us to adjudicate the grievances of which they complain?

It is not our function, and it is beyond our power, to write legal essays or to give legal opinions, however solemnly requested and however great the national emergency. See the correspondence between Secretary of State Jefferson and Chief Justice Jay, 3 Johnson, Correspondence and Public Papers of John Jay, 486–89. Unlike the rôle allowed to judges in a few state courts and to the Supreme Court of Canada, our exclusive business is litigation.[4] The requisites of litigation are not satisfied

---

[3] This is subject to some narrow exceptions not here relevant. See, e. g., *McKnett* v. *St. Louis & S. F. Ry. Co.,* 292 U. S. 230.

[4] As to advisory opinions in use in a few of the state courts, see J. B. Thayer, Advisory Opinions, reprinted in Legal Essays by J. B. Thayer, at 42 *et seq.;* article on "Advisory Opinions," 1 Enc. Soc. Sci.

when questions of constitutionality though conveyed
through the outward forms of a conventional court pro-
ceeding do not bear special relation to a particular liti-
gant. The scope and consequences of our doctrine of
judicial review over executive and legislative action

475. As to advisory opinions in Canada, see *Attorney-General for
Ontario* v. *Attorney-General for Canada* [1912] A. C. 571. Speaking
of the Canadian system, Lord Chancellor Haldane, in *Attorney Gen-
eral for British Columbia* v. *Attorney General for Canada* [1914]
A. C. 153, 162, said: "It is at times attended with inconveniences,
and it is not surprising that the Supreme Court of the United States
should have steadily refused to adopt a similar procedure, and should
have confined itself to adjudication on the legal rights of litigants in
actual controversies." For further animadversions on advisory pro-
nouncements by judges, see Lord Chancellor Sankey in *In re The
Regulation and Control of Aeronautics in Canada* [1932] A. C. 54,
66: "We sympathize with the view expressed at length by New-
combe, J., which was concurred in by the Chief Justice, [of Canada]
as to the difficulty which the Court must experience in endeavoring
to answer questions put to it in this way."

Australia followed our Constitutional practice in restricting her
courts to litigious business. The experience of English history which
lay behind it was thus put in the Australian Constitutional Convention
by Mr. (later Mr. Justice) Higgins: "I feel strongly that it is most
inexpedient to break in on the established practice of the English
law, and, secure decisions on facts which have not arisen yet. Of
course, it is a matter that lawyers have experience of every day,
that a judge does not give the same attention, he can not give that
same attention, to a suppositious case as when he feels the pressure
of the consequences to a litigant before him. . . . But here is an
attempt to allow this High Court, before cases have arisen, to make
a pronouncement upon the law that will be binding. I think
the imagination of judges, like that of other persons, is limited, and
they are not able to put before their minds all the complex circum-
stances which may arise and which they ought to have in their minds
when giving a decision. If there is one thing more than another which
is recognized in British jurisprudence it is that a judge never gives a
decision until the facts necessary for that decision have arisen." Rep.
Nat. Austral. Conv. Deb. (1897) 966–67.

should make us observe fastidiously the bounds of the litigious process within which we are confined.[5] No matter how seriously infringement of the Constitution may be called into question, this is not the tribunal for its challenge except by those who have some specialized interest of their own to vindicate, apart from a political concern which belongs to all. *Stearns* v. *Wood,* 236 U. S. 75; *Fairchild* v. *Hughes,* 258 U. S. 126.

In the familiar language of jurisdiction, these Kansas legislators must have standing in this Court. What is their distinctive claim to be here, not possessed by every Kansan? What is it that they complain of, which could not be complained of here by all their fellow citizens? The answer requires analysis of the grievances which they urge.

They say that it was beyond the power of the Kansas legislature, no matter who voted or how, to ratify the Child Labor Amendment because for Kansas there was no Child Labor Amendment to ratify. Assuming that an amendment proposed by the Congress dies of inanition after what is to be deemed a "reasonable" time, they claim that, having been submitted in 1924, the proposed Child Labor Amendment was no longer alive in 1937. Or, if alive, it was no longer so for Kansas because, by a prior resolution of rejection in 1925, Kansas had exhausted her power. In no respect, however, do these objections relate to any secular interest that pertains to these Kansas legislators apart from interests that belong to the entire commonalty of Kansas. The fact that these legislators are part of the ratifying mechanism while the ordinary citizen of Kansas is not, is wholly irrelevant to this issue. On this aspect of the case the problem would be exactly the same if all but one legislator had voted for ratification.

---

[5] See the series of cases beginning with *Hayburn's Case,* 2 Dall. 409, through *United States* v. *West Virginia,* 295 U. S. 463.

Indeed the claim that the Amendment was dead or that it was no longer open to Kansas to ratify, is not only not an interest which belongs uniquely to these Kansas legislators; it is not even an interest special to Kansas. For it is the common concern of every citizen of the United States whether the Amendment is still alive, or whether Kansas could be included among the necessary "three-fourths of the several States."

These legislators have no more standing on these claims of unconstitutionality to attack "Senate Concurrent Resolution No. 3" than they would have standing here to attack some Kansas statute claimed by them to offend the Commerce Clause. By as much right could a member of the Congress who had voted against the passage of a bill because moved by constitutional scruples urge before this Court our duty to consider his arguments of unconstitutionality.

Clearly a Kansan legislator would have no standing had he brought suit in a federal court. Can the Kansas Supreme Court transmute the general interest in these constitutional claims into the individualized legal interest indispensable here? No doubt the bounds of such legal interest have a penumbra which gives some freedom in judging fulfilment of our jurisdictional requirements. The doctrines affecting standing to sue in the federal courts will not be treated as mechanical yardsticks in assessing state court ascertainments of legal interest brought here for review. For the creation of a vast domain of legal interests is in the keeping of the states, and from time to time state courts and legislators give legal protection to new individual interests. Thus, while the ordinary state taxpayer's suit is not recognized in the federal courts, it affords adequate standing for review of state decisions when so recognized by state courts. *Coyle* v. *Smith*, 221 U. S. 559; *Heim* v. *McCall*, 239 U. S. 175.

But it by no means follows that a state court ruling on the adequacy of legal interest is binding here. Thus, in *Tyler* v. *Judges,* 179 U. S. 405, the notion was rejected that merely because the Supreme Judicial Court of Massachusetts found an interest of sufficient legal significance for assailing a statute, this Court must consider such claim. Again, this Court has consistently held that the interest of a state official in vindicating the Constitution of the United States gives him no legal standing here to attack the constitutionality of a state statute in order to avoid compliance with it. *Smith* v. *Indiana,* 191 U. S. 138; *Braxton County Court* v. *West Virginia,* 208 U. S. 192; *Marshall* v. *Dye,* 231 U. S. 250; *Stewart* v. *Kansas City,* 239 U. S. 14. Nor can recognition by a state court of such an undifferentiated, general interest confer jurisdiction on us. *Columbus & Greenville Ry. Co.* v. *Miller,* 283 U. S. 96, reversing *Miller* v. *Columbus & Greenville Ry.,* 154 Miss. 317; 122 So. 366. Contrariwise, of course, an official has a legally recognized duty to enforce a statute which he is charged with enforcing. And so, an official who is obstructed in the performance of his duty under a state statute because his state court found a violation of the United States Constitution may, since the Act of December 23, 1914, 38 Stat. 790, ask this Court to remove the fetters against enforcement of his duty imposed by the state court because of an asserted misconception of the Constitution. Such a situation is represented by *Blodgett* v. *Silberman,* 277 U. S. 1, and satisfied the requirement of legal interest in *Boynton* v. *Hutcheson,* 291 U. S. 656, *certiorari* dismissed on another ground in 292 U. S. 601.[6]

---

[6] A quick summary of the jurisdiction of this Court over state court decisions leaves no room for doubt that the fact that the present case is here on *certiorari* is wholly irrelevant to our assumption of jurisdiction. Section 25 of the First Judiciary Act gave reviewing power to this Court only over state court decisions *denying* a claim of federal

We can only adjudicate an issue as to which there is a claimant before us who has a special, individualized stake in it. One who is merely the self-constituted spokesman of a constitutional point of view can not ask us to pass on it. The Kansas legislators could not bring suit explicitly on behalf of the people of the United States to determine whether Kansas could still vote for the Child Labor Amendment. They can not gain standing here by having brought such a suit in their own names. Therefore, none of the petitioners can here raise questions concerning the power of the Kansas legislature to ratify the Amendment.

This disposes of the standing of the three members of the lower house who seek to invoke the jurisdiction of this Court. They have no standing here. Equally with-

---

right. This restriction was, of course, born of fear of disobedience by the state judiciaries of national authority. The Act of September 6, 1916, 39 Stat. 726, withdrew from this obligatory jurisdiction cases where the state decision was against a "title, right, privilege, or immunity" claimed to exist under the Constitution, laws, treaties or authorities of the United States. This change, which was inspired mainly by a desire to eliminate from review as of right cases arising under the Federal Employers' Liability Act, left such review only in cases where the validity of a treaty, statute or authority of the United States was drawn into question and the decision was against the validity, and in cases where the validity of a statute of a state or a state authority was drawn into question on the grounds of conflict with federal law and the decision was in favor of its validity. The Act of February 13, 1925, 43 Stat. 936, 937, extended this process of restricting our obligatory jurisdiction by transferring to review by *certiorari* cases in which the state court had held invalid an "authority" claimed to be exercised under the laws of the United States or in which it had upheld, against claims of invalidity on federal grounds, an "authority" exercised under the laws of the states. Neither the terms of these two restrictions nor the controlling comments in committee reports or by members of this Court who had a special share in promoting the Acts of 1916 and 1925, give any support for believing that by contracting the range of obligatory jurisdiction over state adjudications Congress

out litigious standing is the member of the Kansas Senate who voted for "Senate Concurrent Resolution No. 3." He cannot claim that his vote was denied any parliamentary efficacy to which it was entitled. There remains for consideration only the claim of the twenty nay-voting senators that the Lieutenant-Governor of Kansas, the presiding officer of its Senate, had, under the Kansas Constitution, no power to break the tie in the senatorial vote on the Amendment, thereby depriving their votes of the effect of creating such a tie. Whether this is the tribunal before which such a question can be raised by these senators must be determined even before considering whether the issue which they pose is justiciable. For the latter involves questions affecting the distribution of constitutional power which should be postponed to preliminary questions of legal standing to sue.

enlarged the jurisdiction of the Court by removing the established requirement of legal interest as a threshold condition to being here.

Nor does the Act of December 23, 1914, 38 Stat. 790, touch the present problem. By that Act, Congress for the first time gave this Court power to review state court decisions *sustaining* a federal right. For this purpose it made *certiorari* available. The Committee reports and the debates on this Act prove that its purpose was merely to remove the unilateral quality of Supreme Court review of state court decisions on constitutional questions as to which this Court has the ultimate say. The Act did not create a new legal interest as a basis of review here; it built on the settled doctrine that an official has a legally recognizable duty to carry out a statute which he is supposed to enforce.

Thus, prior to the Act of 1914, the Kentucky case, *post,* p. 474, could not have come here at all, and prior to 1916, the Kansas case would have come here, if at all, by writ of error. By allowing cases from state courts which previously could not have come here at all to come here on *certiorari* the Act of 1914 merely lifted the previous bar—that a federal claim had been sustained—but left every other requisite of jurisdiction unchanged. Similarly, no change in these requisites was affected by the Acts of 1916 and 1925 in confining certain categories of litigation from the state courts to our discretionary instead of obligatory reviewing power.

The right of the Kansas senators to be here is rested on recognition by *Leser* v. *Garnett,* 258 U. S. 130, of a voter's right to protect his franchise. The historic source of this doctrine and the reasons for it were explained in *Nixon* v. *Herndon,* 273 U. S. 536, 540. That was an action for $5,000 damages against the Judges of Elections for refusing to permit the plaintiff to vote at a primary election in Texas. In disposing of the objection that the plaintiff had no cause of action because the subject matter of the suit was political, Mr. Justice Holmes thus spoke for the Court: "Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years, since *Ashby* v. *White,* 2 Ld. Raym. 938, 3 *id.* 320, and has been recognized by this Court." "Private damage" is the clue to the famous ruling in *Ashby* v. *White, supra,* and determines its scope as well as that of cases in this Court of which it is the justification. The judgment of Lord Holt is permeated with the conception that a voter's franchise is a personal right, assessable in money damages, of which the exact amount "is peculiarly appropriate for the determination of a jury," see *Wiley* v. *Sinkler,* 179 U. S. 58, 65, and for which there is no remedy outside the law courts. "Although this matter relates to the parliament," said Lord Holt, "yet it is an injury precedaneous to the parliament, as my Lord Hale said in the case of *Bernardiston* v. *Soame,* 2 Lev. 114, 116. The parliament cannot judge of this injury, nor give damage to the plaintiff for it: they cannot make him a recompense." 2 Ld. Raym. 938, 958.

The reasoning of *Ashby* v. *White* and the practice which has followed it leave intra-parliamentary controversies to parliaments and outside the scrutiny of law courts. The procedures for voting in legislative assem-

blies—who are members, how and when they should vote, what is the requisite number of votes for different phases of legislative activity, what votes were cast and how they were counted—surely are matters that not merely concern political action but are of the very essence of political action, if "political" has any connotation at all. *Field v. Clark*, 143 U. S. 649, 670, *et seq.; Leser* v. *Garnett*, 258 U. S. 130, 137. In no sense are they matters of "private damage." They pertain to legislators not as individuals but as political representatives executing the legislative process. To open the law courts to such controversies is to have courts sit in judgment on the manifold disputes engendered by procedures for voting in legislative assemblies. If the doctrine of *Ashby* v. *White* vindicating the private rights of a voting citizen has not been doubted for over two hundred years, it is equally significant that for over two hundred years *Ashby* v. *White* has not been sought to be put to purposes like the present. In seeking redress here these Kansas senators have wholly misconceived the functions of this Court. The writ of *certiorari* to the Kansas Supreme Court should therefore be dismissed.

MR. JUSTICE BUTLER, dissenting.

The Child Labor Amendment was proposed in 1924; more than 13 years elapsed before the Kansas legislature voted, as the decision just announced holds, to ratify it. Petitioners insist that more than a reasonable time had elapsed and that, therefore, the action of the state legislature is without force. But this Court now holds that the question is not justiciable, relegates it to the "consideration of the Congress when, in the presence of certified ratifications by three-fourths of the States the time arrives for the promulgation of the adoption of the amendment" and declares that the decision by Congress would not be subject to review by the courts.

In *Dillon* v. *Gloss,* 256 U. S. 368, one imprisoned for transportation of intoxicating liquor in violation of § 3 of the National Prohibition Act, instituted habeas corpus proceedings to obtain his release on the ground that the Eighteenth Amendment was invalid because the resolution proposing it declared that it should not be operative unless ratified within seven years. The Amendment was ratified in less than a year and a half. We definitely held that Article V impliedly requires amendments submitted to be ratified within a reasonable time after proposal; that Congress may fix a reasonable time for ratification, and that the period of seven years fixed by the Congress was reasonable.

We said:

"It will be seen that this article says nothing about the time within which ratification may be had—neither that it shall be unlimited nor that it shall be fixed by Congress. What, then, is the reasonable inference or implication? Is it that ratification may be had at any time, as within a few years, a century or even a longer period; or that it must be had within some reasonable period which Congress is left free to define?

"We do not find anything in the Article which suggests that an amendment once proposed is to be open to ratification for all time, or that ratification in some of the States may be separated from that in others by many years and yet be effective. We do find that which strongly suggests the contrary. First, proposal and ratification are not treated as unrelated acts, but as succeeding steps in a single endeavor, the natural inference being that they are not to be widely separated in time. Secondly, it is only when there is deemed to be a necessity therefor that amendments are to be proposed, the reasonable implication being that when proposed they are to be considered and disposed of presently. Thirdly, as ratification is but the expression of the approbation of the people and is to be effective when had in three-fourths of the

States, there is a fair implication that it must be sufficiently contemporaneous in that number of States to reflect the will of the people in all sections at relatively the same period, which of course ratification scattered through a long series of years would not do. These considerations and the general purport and spirit of the Article lead to the conclusion expressed by Judge Jameson [in his Constitutional Conventions, 4th ed. § 585] 'that an alteration of the Constitution proposed today has relation to the sentiment and the felt needs of today, and that, if not ratified early while that sentiment may fairly be supposed to exist, it ought to be regarded as waived, and not again to be voted upon, unless a second time proposed by Congress.' That this is the better conclusion becomes even more manifest when what is comprehended in the other view is considered; for, according to it, four amendments proposed long ago—two in 1789, one in 1810, and one in 1861—are still pending and in a situation where their ratification in some of the States many years since by representatives of generations now largely forgotten may be effectively supplemented in enough more States to make three-fourths by representatives of the present or some future generation. To that view few would be able to subscribe, and in our opinion it is quite untenable. We conclude that the fair inference or implication from Article V is that the ratification must be within some reasonable time after the proposal.

"Of the power of Congress, keeping within reasonable limits, to fix a definite period for the ratification we entertain no doubt. . . . Whether a definite period for ratification shall be fixed so that all may know what it is and speculation on what is a reasonable time may be avoided, is, in our opinion, a matter of detail which Congress may determine as an incident of its power to designate the mode of ratification. It is not questioned that seven years, the period fixed in this instance, was reason-

able, if power existed to fix a definite time; nor could it well be questioned considering the periods within which prior amendments were ratified."

Upon the reasoning of our opinion in that case, I would hold that more than a reasonable time had elapsed* and

---

*CHRONOLOGY OF CHILD LABOR AMENDMENT.

[A State is said to have "rejected" when both Houses of its legislature passed resolutions of rejection, and to have "refused to ratify" when both Houses defeated resolution for ratification.]

June 2, 1924, Joint Resolution deposited in State Department. In that year, Arkansas ratified; North Carolina rejected. *Ratification, 1; rejection, 1.*

1925, Arizona, California and Wisconsin ratified; Florida, Georgia, Indiana, Kansas, Maine, Massachusetts, Minnesota, Missouri, New Hampshire, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Vermont rejected; Connecticut, Delaware and South Dakota refused to ratify. *Ratifications, 4; rejections, 16; refusals to ratify, 3.*

1926, Kentucky and Virginia rejected. *Ratifications, 4; rejections, 18; refusals to ratify, 3.*

1927, Montana, ratified; Maryland rejected. *Ratifications, 5; rejections, 19; refusals to ratify, 3.*

1931, Colorado ratified. *Ratifications, 6; rejections, 19; refusals to ratify, 3.*

1933, Illinois, Iowa, Michigan, New Jersey, North Dakota, Ohio, Oklahoma, Oregon, Washington and West Virginia ratified as did also Maine, Minnesota, New Hampshire, and Pennsylvania, which had rejected in 1925. *Ratifications, 20; rejections, (eliminating States subsequently ratifying) 15; refusals to ratify, 3.*

1935, Idaho and Wyoming ratified, as did Utah and Indiana, which had rejected in 1925. As in 1925, Connecticut refused to ratify. *Ratifications, 24; rejections, 13; refusals to ratify, 3.*

1936, Kentucky, which had rejected in 1926, ratified. *Ratifications, 25; rejections, 12; refusals to ratify, 3.*

1937, Nevada and New Mexico ratified, as did Kansas, which had rejected in 1925. Massachusetts, which had rejected in 1925, refused to ratify. *Ratifications, 28; rejections, 11; refusals to ratify, 3.*

Six States are not included in this list: Alabama, Louisiana, Mississippi, Nebaska, New York and Rhode Island. It appears that there has never been a vote in Alabama or Rhode Island. Louisiana

that the judgment of the Kansas supreme court should be reversed.

The point that the question—whether more than a reasonable time had elapsed—is not justiciable but one for Congress after attempted ratification by the requisite number of States, was not raised by the parties or by the United States appearing as *amicus curiae;* it was not suggested by us when ordering reargument. As the Court, in the *Dillon* case, did directly decide upon the reasonableness of the seven years fixed by the Congress, it ought not now, without hearing argument upon the point, hold itself to lack power to decide whether more than 13 years between proposal by Congress and attempted ratification by Kansas is reasonable.

MR. JUSTICE MCREYNOLDS joins in this opinion.

house of representatives has three times (1924, 1934 and 1936) defeated resolutions for ratification. In Mississippi, the Senate adopted resolution for ratification in 1934, but in 1936 another Senate resolution for ratification was adversely reported. In Nebraska, the House defeated ratification resolutions in 1927 and 1935, but the Senate passed such a resolution in 1929. In New York, ratification was defeated in the House in 1935 and 1937, and in the latter year, the Senate passed such a resolution.