January 16, 1979

## 79-4 MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Constitutional Law—Constitution—Article V—The Amending Process—The Convention Method

This responds to your request for our views on several questions pertaining to the process of amending the Constitution by convention. We should note at the outset that, because no amending convention has ever been called, there is little history or law on the subject. Much of our discussion here is thus necessarily predicated not on history or judicial decisions, but on the views of legal scholars. A number of important questions have been identified in the scholarly writing[1] and we have endeavored to outline the most important of those. Most of these issues lack clear answers, and in the time available we have not undertaken to resolve all of them.

Article V of the Constitution reads:

> The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress * * *.

The provision for State initiative was regarded by the Framers of the Constitution as an important safety valve to allow the States to correct Federal abuses of power or to propose amendments Congress refused to propose.

---

[1] Much of the legal writing in this area was occasioned by two events: (1) the effort of a large number of States to call for a convention on the reapportionment issue; and (2) a bill introduced by Senator Ervin and passed by the Senate which provided for procedures necessary to effectuate the convention process.

In order to initiate the convention process, two-thirds of the States must submit applications to Congress. Before issuing its "call" for the convention, Congress must determine whether the requisite number of applications has been received. The authority to call the convention, we think, necessarily requires a determination that the basic conditions for a convention are met. However, once it has been determined that two-thirds of the States have submitted valid applications, Congress is generally thought to be obliged to call a convention.

Although Article V says nothing as to the organization of a convention, it is the general view that Congress may establish the convention's "ground rules"—*e.g.*, the time and place of meeting, the number of delegates, the basis of representation, etc. Since Article V contemplates a "Convention for *proposing* Amendments" [emphasis added], most authorities believe that the convention must be free to weigh and evaluate various alternatives and to frame its own proposed amendment. If that is so, Congress would not have the power to structure the precise wording of an amendment. Once drafted and approved by the convention, the proposed amendment must then be ratified, as Article V specifies, "by the Legislatures of three fourths of the several States or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress."

Several questions may arise with respect to the validity of State applications. The first is whether an application might lapse over time. In order that the applications demonstrate a national consensus, we believe, as does every authority known to us, that the States' applications must be reasonably contemporaneous. This view is supported by the decision in *Dillon* v. *Gloss*, 256 U.S. 368, 274–75 (1921), in which the Supreme Court spoke of a contemporaneous State consensus as necessary to support an amendment. While this case dealt with ratification by the States, it is generally agreed that notions of responsible timeliness should also be required in the application process. There are, however, widely divergent views as to what constitutes a "contemporaneous" period of time— suggestions range from a generation to 2 years. Congress will necessarily have to make a judgment in this area, taking into account the time necessary for the States to respond to an issue and perhaps other factors such as changed political, economic, or social conditions. Congress' focus here should be on the question whether, in fact, the applications fairly reflect the current judgment of the requisite number of States that a constitutional change is needed. It should be noted that the bill introduced several years ago by Senator Ervin, which passed the Senate but was never considered further, provided that all calls must have occurred within a 7-year period. For your information, the approximately 20 calls related to the Federal budget issue have come within the past 3 to 4 years.

A second question is whether State applications on different topics may (or must) be aggregated for purposes of determining whether two-thirds of the States seek a convention. The view of most, but not all, legal authorities

17

is that applications relating to different matters should not be counted together. In our opinion, this position is correct. Unless the applications deal with the same issue, it would seem that the fundamental prerequisite of calling a convention, *i.e.*, the existence of a national consensus that a constitutional change is desirable, is not satisfied. It is generally agreed that States may call for a general revision of the Constitution, but short of such a general undertaking, we think it would circumvent one of the central principles of the amendment process to allow the combining of calls on issues as disparate as reapportionment, abortion, or budgetary restraint, no one of which was deemed by two-thirds of the States as worthy of consideration. We have been advised that the recent flurry of applications have been variously stated as relating to limiting the Federal debt, balancing the Federal budget, or prohibiting deficit spending, matters that might or might not be regarded as proper subjects for a single call.

If this is a correct view of the law, the next question is how similar the States' applications must be in order for them to be aggregated. The various authorities agree that the applications need not be identical, but that it suffices if the States request a convention to address the same general problem or issue. The Congress, in deciding whether the requisite number of applications has been made, must necessarily determine whether this requirement is met.

Once Congress ascertains that a convention is appropriate, the next question is whether Congress may impose limitations on the convention's deliberations. There is substantial disagreement among the legal authorities on this question. Those who believe that the convention may not be limited, but may consider whatever issues it deems desirable, rely on the following arguments. The language referring to a "Convention for proposing Amendments" suggests that the convention may propose any amendment it sees fit to support. Since the Framers provided the convention process as a means to check Federal abuses, some argue that it would undermine this purpose to allow Congress to limit the convention's deliberations. In addition, some theorists assert that the States cannot be deemed to be authorized to limit an instrumentality created under the Constitution. In fact, some argue that a convention is a body endowed with all power residing in the people, and as such may not be limited by the States, the branches of the Federal Government, or even the Constitution.

The majority view, however, is that Congress may limit the convention's deliberations. The arguments for this proposition, at least on our consideration of them, appear to be persuasive. Since Article V allows a convention to be called only where there is a consensus among the States as to an area of proposed change, the convention should not be allowed to discuss issues as to which there is no demonstrated consensus. The history of Article V suggests that the convention process was intended to serve as a means of considering specific amendments. Since the States would still be free to initiate any amendment they wished, this view is entirely consistent with the underlying purpose of Article V. Some have also

18

argued that this view furthers the purpose of Article V, since the States may be less likely to call for conventions if they know that those conventions are free to propose changes beyond the proposed areas. Finally, contrary to the view of some commentators, it is contended that a convention is not a sovereign body, but rather only a body summoned pursuant to the terms and under the authority of Article V. The House of Delegates of the American Bar Association in its recent deliberations on the amendment process concluded that limitations on the convention would be appropriate.

The question whether the President may become involved in Congress' call for a convention is also a much-debated one. Those who believe the President must be involved in this process rely on Article I, section 7, of the Constitution, which requires any "Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives [is] necessary * * * shall be presented to the President" for approval. Since Congress' call for a convention must necessarily provide the "ground rules" of the convention, the call would have the force of law and thus might be seen as requiring Presidential approval under this provision. As you know, in our opinions on the "legislative veto" we have taken the view generally that the only way for Congress to "make law" is through Article I, section 7, and that the President must always have a veto function. The argument in favor of Presidential involvement would seem particularly strong if Congress, in the process of issuing a call, is required, as we suppose it is, to appropriate funds for the convention's operations; ordinarily, we would presume a role for the executive branch whenever funds are to be appropriated. The fact that the Supreme Court decided in *Hollingsworth* v. *Virginia*, 3 Dall. 378, 381 (1798), that the President "has nothing to do with the proposition, or adoption, of amendments to the constitution" has been discounted by these authorities on the ground the opinion offers no rationale and because the decision was rendered in the context of an amendment proposed by Congress.

Those who believe that the President may have no role in approving or vetoing Congress' call for a convention rely on the language in Article V that "the Congress" is to call a convention and on the Supreme Court's decision in *Hollingsworth* v. *Virginia*. In addition, these authorities argue that Presidential involvement may be contrary to the purpose underlying Article V. Such involvement would make the convention amendment process undergo a requirement not involved in the usual mode of amending the Constitution; it would also allow the President to block a process whose purpose is to allow the States some independence in the area of constitutional change. The requirement of Article I, section 7, these commentators contend, is inapplicable here since Congress does not judge the substance of the proposed amendments, but merely regulates matters necessary to the implementation of Article V. Finally, it is argued that Presidential involvement is unnecessary since, in light of the fact that the proposal is advanced by the States and must be referred to the convention,

there is little opportunity for meaningful review or to safeguard the Executive's powers.[2]

*Role of the courts.* In *Coleman* v. *Miller*, 307 U.S. 433 (1939), the Supreme Court held several aspects of the amendment process to be political questions and nonjusticiable. In our view, however, this decision cannot be taken to mean that all questions arising in the course of the amendment process will not be reviewed by the courts. In several decisions prior to *Coleman* the court had reviewed and resolved such questions. *See e.g., Dillon* v. *Gloss, supra; Hollingsworth* v. *Virginia, supra.* The fact that *Coleman* did not overrule these cases suggests that review on some questions is still available, particularly if the question does not involve an assessment of political, social, or economic factors, which were thought to preclude review in *Coleman.* In addition, decisions after *Coleman* suggest that the Court may be willing to review questions relating to the amendment process if there is neither a textually demonstrable commitment of their resolution to the Congress nor a lack of judicially discoverable standards by which to resolve the questions presented. *See, e.g., Baker* v. *Carr*, 369 U.S. 186 (1962). The decisions both before and after *Coleman* thus suggest that such issues as the imposition of limits on the convention's deliberations and the President's involvement in the process of amendment by convention may well be reviewable in the courts.

LARRY A. HAMMOND
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[2] You may recall that when the 95th Congress passed the Equal Rights Amendment extension bill, we concluded that a Presidential signature was *not* required but that the President might elect to sign the bill as a matter of discretion. He did elect to do so, but noted the legal conclusion that he was not required to pass on it since it involved a matter within the province of Congress under Article V.