U.S. Representative Dennis J. **KUCINICH, Plaintiff,**

v.

**DEFENSE FINANCE AND ACCOUNTING SERVICE, et al., Defendants.**

**No. 1:02CV155.**

United States District Court, N.D. Ohio, Eastern Division.

Feb. 1, 2002.

Martin D. Gelfand, Office of U.S. Rep. Dennis J. Kucinich, Lakewood, OH, for Dennis J. Kucinich, U.S. Representative, Plaintiff.

Arthur I. Harris, Office of the United States Attorney, Northern District of Ohio, Cleveland, OH, for Defense Finance and Accounting Service, Defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

United States Representative Dennis J. Kucinich ("Kucinich"), representing Ohio's 10th Congressional District in the United States House of Representatives, alleges that the Defense Finance and Accounting Service ("DFAS"), an agency of the Department of Defense ("DoD"), has violated federal law and the United States Constitution by awarding a contract to the ACS Government Solutions Group ("ACS"). Kucinich filed a motion for a temporary restraining order ("TRO") to halt implementation of the contract (Doc. # 4) which DFAS opposed (Doc. # 6). Judge John M. Manos heard a brief argument concerning the motion on January 25, 2002, but declined to rule on it at that time. This Court subsequently held a hearing on the

motion for a TRO on January 28, 2002. For the following reasons, the Court dismisses this case *sua sponte* for lack of jurisdiction.

## I. Background

DFAS is an agency of the DoD. Its primary responsibility is to provide finance and accounting services for the military services, for DoD components, and for other federal activities. For example, DFAS manages the pay accounts for and provides payroll service to approximately 2,500,000 military retirees, surviving annuitants, and other pay recipients supported by the Defense Retiree and Annuitant Pay System. Retirement and Annuitant Pay ("R & A") operations generally involve such services as management of existing accounts, creation of new accounts, performance of pay operations and pay distribution, customer service, generation of distribution of reports and notices to account holders and parties, management and maintenance of the R & A Automated Information System, and data processing. These services have traditionally been performed primarily at sites in Cleveland, Ohio and in Denver, Colorado. They are also the subject of the contract at issue in this case.

In June, 2001, DFAS completed a cost comparison study under the provisions of Office of Budget Management Circular A–76 ("OMB A–76")[1] of the R & A function. The study concluded that a bid submitted by ACS Government Solutions Group, Inc. ("ACS") would result in savings of approximately $12 million over ten years. DFAS therefore reached a tentative decision to convert R & A operation from in-house to contract performance. Employee unions appealed the results of the study under the

appropriate OMB A–76 procedures, and that appeal was denied on August 3, 2001. *See* Mem. of Def. in Opp. to Pl. Mot. for a TRO ("Def.Mem."), Exh. 1. The process of transitioning in-house R & A activities to ACS began on September 5, 2001, with an effective date of January 26, 2002. On January 25, 2002, Kucinich filed suit in this Court and filed the pending motion for a TRO, alleging that the award of the ACS contract violated provisions of the Federal Activities Inventory Reform Act of 1998 ("FAIR"), Pub.L. No. 105–270, 112 Stat. 2382 (codified at 10 U.S.C. § 2464, 31 U.S.C. § 501 (1994)), and of OMB A–76, and unconstitutionally restricted the rights of the in-house employees to due process, equal protection, and free speech.

## II. Standard

A district court must consider four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *Southwest Williamson Cty. Community v. Slater*, 243 F.3d 270, 277 (6th Cir.2001). These four factors are not to be mechanically imposed. *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537–28 (6th Cir.1978). "'The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met.'" *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001) (quoting *Six Clinics Holding Corp., II v.*

---

1. This circular governs the performance of commercial activities by executive agencies and requires agencies to perform cost comparison analyses to determine whether a commercial product or service should be provided

by the agency or by a private sector source. *See Am. Fed. of Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1296 (Fed.Cir. 2001).

*Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)). Nevertheless, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir.2000) (citing *Michigan St. AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997)).

## III. Analysis

■ In evaluating the four factors relevant to consideration of a motion for a TRO, the Court need look no further than the first requirement—likelihood of success on the merits—to find that a TRO should not issue in this case. The Court finds that Kucinich lacks standing to bring this case before this Court. Thus, not only is there no likelihood of success on the merits for Kucinich, but this Court lacks jurisdiction to consider his claims at all. The Court therefore finds it appropriate to dismiss this case sua sponte for lack of jurisdiction.

■ Standing is a "bedrock requirement" of Article III, § 2's grant to the federal courts of jurisdiction over cases and controversies. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Supreme Court has said in no uncertain terms that: "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). To meet Article III's standing requirement, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d

556 (1984). Furthermore, the alleged injury to the plaintiff must be "an invasion of a legally protected interest which is ... concrete and particularized," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and must be "traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The Supreme Court has also suggested that the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

In this case, Kucinich argues that Supreme Court precedent strictly limiting the standing of members of Congress to sue has left open the possibility of "institutional standing" to sue "within their representational capacity." Ver. Compl. at ¶ 15. Kucinich's reading of the relevant cases is not persuasive, however. In 1997, in *Raines v. Byrd*, the Supreme Court held that members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act. *Raines*, 521 U.S. at 830, 117 S.Ct. 2312. The legislators relied primarily on language in the Supreme Court's decision in *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), a case to which Kucinich also refers, finding that the state legislator plaintiffs in that case had "a plain, direct and adequate interest in maintaining the effectiveness of their votes," *id.* at 438, 59 S.Ct. 972. The *Raines* Court severely limited the reach of *Coleman*, however, observing that the *Coleman* plaintiffs' votes were "completely nullified," if, as they alleged, their state was considered to have ratified an amendment to the federal constitutional

despite the fact that there had been no majority vote in favor of ratification. *Raines*, 521 U.S. at 825–26, 117 S.Ct. 2312; *Chenoweth v. Clinton*, 997 F.Supp. 36, 39 (D.D.C.1998) (recognizing that *Raines* "substantially limited" the reach of *Coleman* ), *aff'd*, 181 F.3d 112 (D.C.Cir.1999). The plaintiffs in *Raines*, who alleged that the Line Item Veto Act would seriously dilute their votes in Congress and would fundamentally alter the dynamic of law-making, nevertheless did not allege an injury that reached the level of complete nullification contemplated by *Coleman*, and therefore could not fit within the narrow confines of the *Coleman* exception.

In so holding, the *Raines* Court also made a fundamental distinction between suits in which a member of Congress argues that he or she has been deprived of something to which he or she is personally entitled and suits in which the member alleges an institutional injury, such as the diminution of legislative power. *Id.* at 820–21, 117 S.Ct. 2312. In the former case, the member of Congress has standing to sue. In the latter case, the member of Congress lacks standing, unless the injury alleged is severe enough to meet *Coleman*'s strict "complete nullification" standard. The Court described the *Raines* plaintiffs' predicament in this way:

> If one of the [*Raines* plaintiff] Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

*Id.* at 821, 117 S.Ct. 2312. Kucinich seizes on the "trustee for his constituents" language, arguing that this "passing refer-

ence . . . leaves open the extent of personal injury a Member suffers when the constituents he represents suffer injuries which affect the Congressional District as a whole." Mot. for a TRO at ¶ 8. If anything, however, the Court was doing just the opposite in the quoted passage. The Court was merely distinguishing plaintiffs like Kucinich and the *Raines* plaintiffs, who bring suit in their institutional capacity as trustees for their constituents and who therefore lack standing unless they fall under the narrow *Coleman* exception, from plaintiffs like Adam Clayton Powell in *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), who alleged a personal injury from being excluded from Congress despite having been elected by a majority of his constituents, and who therefore had standing to sue.

■ Kucinich argues that "DFAS's wrongdoing with respect to the awarding of contracts, will cause the displacement of workers, including the loss of jobs and collective bargaining rights. . . . These job losses can cause a negative multiplier effect to the region's economy, causing further injury to all constituents, including Rep. Kucinich himself. Rep. Kucinich, *as the representative of all his constituents*, is attempting to reverse a wrong and should be encouraged by law and equity to do so." Mot. for TRO at ¶ 10 (emphasis added). While general notions of equity may indeed encourage hearing Kucinich's claims, jurisdiction is an absolute prerequisite, and considerations of equity must cede to it. Kucinich, bringing this suit "as the representative of all his constituents," is clearly seeking to vindicate an institutional injury. While his efforts to safeguard the rights of his constituents are certainly laudable, they cannot, under *Raines*, support a finding of standing.[2]

2. Nor can Kucinich's "multiplier effect" argument support jurisdiction. Kucinich himself

Kucinich, with his "trustee for his constituents" argument, urges this Court to carve out a new exception, in addition to the narrow *Coleman* standard, to the *Raines* Court's holding concerning the standing of members of Congress to sue over nonpersonal harms. Kucinich argues that the *Raines* line of cases concerns institutional harms to legislators functioning in their *legislative* capacity. He would have this Court distinguish his suit, which, he argues, is brought in his *representational* capacity, from that line of cases. As a member of Congress, Kucinich posits, his duties include not only legislating, but also representing his constituents as their trustees, essentially acting as an advocate for them in the same way that a union or other advocacy group fights for the rights of its members. These groups, Kucinich correctly observes, have generally been found to have standing to sue on behalf of their members. In fact, the Sixth Circuit has held that an association representing the interests of gun owners had standing to sue on behalf of its members if it could satisfy three requirements: "(1) Its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the association's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the

lawsuit." *Peoples Rts. Org. v. City of Columbus,* 152 F.3d 522, 527 (6th Cir.1998) (citing *Hunt v. Washington St. Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

It would, however, be unwise and perhaps dangerous for this Court to carve out a new exception to *Raines* for legislators suing in their representational capacity. First of all, Kucinich does not fit comfortably within the framework of the *Peoples Rights Organization* test. He is not, after all, an organization, nor does he have a well-defined, specific mandate in the sense that organizations fitting the test do. Furthermore, it is unlikely that those whose interests he seeks to protect—the affected employees—would have standing to sue in this Court.

OMB A-76 provides for administrative appeals of cost comparison decisions by aggrieved parties, including employees and their unions. 28 U.S.C. § 1491(b)(1) provides a right to appeal the administrative decision in federal court, creating "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or

---

will of course not lose his job as a result of DFAS's actions. The only personal injury Kucinich is able to allege is a potential, negative ripple effect on the economy of the region in which he lives. This alleged injury is not actually personal to Kucinich, however, but is shared by all citizens in the affected region and therefore cannot serve as the basis for standing. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."). Furthermore, this concern is simply too hypothetical, especially giv-

en that DFAS's decision to contract out was based on its determination that doing so would benefit taxpayers like Kucinich. Even if this determination reflects a bad policy decision, it was nonetheless made by the body to which the duty to make such decisions was delegated by Kucinich and his colleagues in Congress. As such, Kucinich has no more standing to sue than does any other taxpayer in the affected region, and his only remedy is the one he possesses by virtue of his position as an elected official, that is, to convince his colleagues to amend the statutes regulating government contracts and forbidding federal court challenges by affected employees and unions.

a proposed procurement." As of January 1, 2001, under the sunset provision of the Administrative Dispute Resolution Act of 1996 ("ADRA"), the Court of Federal Claims has exclusive jurisdiction over these actions. ADRA, Pub.L. No. 104–320, 110 Stat. 3870 ("The jurisdiction of the district courts of the United States over [bid protest actions under] section 1491(b)(1) of title 28, United States Code ... shall terminate on January 1, 2001."). The Federal Circuit has definitively ruled, after carefully scrutinizing the effects of FAIR and the ADRA on the bid protest procedure, that employees and unions lack standing to bring bid protest actions in federal court because they are not "interested parties" within the zone of interest of the statute, and the Supreme Court recently denied certiorari in the case. *Am. Fed'n of Govt. Employees, AFL–CIO v. United States*, 258 F.3d 1294 (Fed.Cir. 2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 920, —— L.Ed.2d —— (2002).

The Sixth Circuit was previously perhaps the only circuit that recognized the standing of employees and unions to bring bid protest actions in federal court. *See Diebold v. United States*, 947 F.2d 787 (6th Cir.1991); *Nat'l Air Traffic Controllers Assoc. v. Pena*, No. 95–3016, 1996 WL 102421 (6th Cir. Mar.7, 1996). Notably, however, the only court within the Sixth Circuit to consider the issue again since enactment of FAIR and the ADRA and since the Claims Court decision in *AFGE*, *Am. Fed. of Gov't Employees, AFL–CIO v. United States*, 46 Fed. Cl. 586 (2000), distinguished this Sixth Circuit precedent and followed *AFGE*'s reasoning in concluding that employees lacked standing to challenge a cost comparison because they were not within the zone of interest Congress intended to protect. *Am. Fed. of Gov't Employees, AFL–CIO v. Babbitt*, 143 F.Supp.2d 927, 939–40 (S.D.Ohio 2001).

Because of the ADRA's sunset provision, however, the aggrieved employees in this case are unable to test the state of the law in this jurisdiction. Their only choice therefore appears to be to file suit in the Court of Federal Claims, where they would be bound by Federal Circuit precedent.

Beyond Kucinich's difficulties in fulfilling the *Peoples Rights Organization* requirements, a much more fundamental concern counsels against finding that Kucinich has standing in his representational capacity. Allowing members of Congress in Kucinich's position to sue on behalf of their constituents in cases where some portion of the constituents are adversely affected by duly enacted legislation would pose grave separation of powers dangers. The *Raines* decision evidenced separation of powers concerns, *see Raines*, 521 U.S. at 826–28, 117 S.Ct. 2312 (recounting various historical events that raised separation of powers and political question concerns), and numerous courts have dismissed cases in which standing was questionable and separation of powers problems were present, *see, e.g., Moore v. U.S. House of Representatives*, 553 F.Supp. 267 (D.D.C.1982) ("The separation of powers concerns which underlie the concept of standing are particularly acute when plaintiffs are members of Congress."); *see also Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 881 (1981) ("Where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, [the] court should exercise its equitable discretion to dismiss the legislator's action.").

In this case, Kucinich, a member of Congress, asks this Court to invalidate the actions of an agency duly given the authority to take such actions by Kucinich's peers in Congress and to declare unconstitutional certain procedural provisions that forbid

the employees or their union from bringing a suit like this themselves. Separation of powers concerns, however, suggest that Kucinich's remedy lies with his colleagues in Congress, whom he must convince to amend the relevant statutes. Under OMB A–76, employees and unions do have some remedy in the form of administrative proceedings.[3] Kucinich's claim that it is unfair that employees have only a limited administrative appeal while disappointed bidders are permitted by statute to appeal further to the federal courts certainly has some persuasive force. Unfortunately, it is not this Court whom Kucinich must persuade, but his peers in Congress. Congress and duly appointed administrative bodies have determined that aggrieved employees cannot bring their claims to this Court, and the constitution does not allow Representative Kucinich to raise the claims for them. As a result, this Court must dismiss this case for lack of jurisdiction.

Finally, the cases cited by Kucinich in support of third-party standing do not compel a different conclusion. "Third-party standing" is a somewhat deceptive label, as these cases make clear. The cases cited by Kucinich involve the prudential principle that limits the opportunity of parties properly in federal court to raise the rights of others rather than the constitutional principle that asks the antecedent question whether the party is properly in court in the first place. *See* 13 Charles Alan Wright et al., Federal Practice and Procedure § 3531.9 (2d ed. 1984 & Supp.2001) (explaining the distinction between the prudential principle and the constitutional inquiry); *see also Quilter v. Voinovich,* 981 F.Supp. 1032, 1038 (N.D.Ohio 1997) (three-judge panel) ("Generally speaking, a plaintiff is permitted to assert the rights of a third party where the plaintiff has suffered his or her own injury-in-fact, there is a nexus between the right asserted and the relationship between the party and the third party, and the litigation will have a material impact on those third-party interests."), *aff'd,* 523 U.S. 1043, 118 S.Ct. 1358, 140 L.Ed.2d 508 (1998). In *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), for example, a landowner was found to have standing to assert the constitutional rights of prospective black tenants denied housing because of racially discriminatory land covenants. In that case, however, the Supreme Court recognized that, although the rights sought to be vindicated belonged to potential black

---

**3.** The Court is certainly sympathetic to the employees' argument that they are unfairly relegated to an administrative remedy while disappointed bidders are allowed to appeal adverse decisions in federal court. *See generally* Robert H. Shriver III, *No Seat at the Table: Flawed Contracting Out Process Unfairly Limits Front–Line Federal Employee Participation,* 30 Pub. Cont. L.J. 613, 636–37 (2001) ("Federal employees are best situated to serve as a check on agency discretion in the contracting out process. . . . In an environment where federal employees are asked to bid just like private sector companies for the right to provide commercial services to the Government, they should have the same rights to challenge irregularities in the bidding process. Ultimately, their jobs may depend upon it."); Charles Tiefer & Jennifer Ferragut, *Let-* *ting Federal Unions Protest Improper Contracting–Out,* 10 Cornell J.L. & Pub. Pol'y 581, 591–98 (2001) (proposing various avenues for reform of the rule forbidding federal employee union bid protests in federal court). That this may prove to be an example of bad policy in action does not mean, however, that it is an example of unconstitutional policy in action. If the employees or unions do wish to challenge the constitutionality of the provisions that have been interpreted as denying them standing, they will have to do so by filing suit in the appropriate court (the Court of Federal Claims) and, if that court dismisses their case, by appealing to the Federal Circuit and ultimately to the United States Supreme Court. This is undoubtedly a tricky path to traverse, but it is the one required under the applicable statutes and under the constitution.

purchasers and not to the plaintiff, the plaintiff would be subject to damages in state court if she chose not to continue to discriminate against nonwhites in the use of her property. *Id.* at 258, 73 S.Ct. 1031. The relationship of the parties in *Barrows* favored a finding of standing because of the potential injury to the plaintiff and because the plaintiff was in the best position to enforce the rights of potential black purchasers. By contrast, Kucinich does not face any cognizable direct injury in this case. Nor can his interests as representative of his constituents be said to be entirely consistent with the interests of the employees about to be replaced. Kucinich is the representative of all of his constituents, not just those that are affected by DFAS's decision. It is in fact probable that other constituents may, rightly or wrongly, support the decision to contract out, which at least theoretically provides them some degree of tax relief. This is not to say that the Court doubts Kucinich's ability to be a forceful and effective advocate for the rights of the affected constituents in this case, but it does point to the indirectness of Kucinich's harm and of his relationship to the rights at issue.

The other cases cited by Kucinich in support of third-party standing are likewise limited to situations where the relationship between the plaintiff and the third party is more direct than the relationship here, where that relationship more directly aligns the interests of the plaintiff and third party, and where the plaintiff has suffered some injury-in-fact that can serve as the basis for constitutional standing. *See, e.g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (allowing a beer vendor to assert the rights of males between 18 and 21 years of age forbidden to purchase beer by state law where the statute focused on the seller rather than the customer and where the statute would directly and adversely affect the seller's

market); *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1972) (allowing physicians to assert the rights of patients to receive an abortion where a state statute would have eliminated the physicians' Medicaid compensation if they provided abortion services); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (allowing a provider of contraceptives to assert the rights of the receiver where the provider was convicted under a statute forbidding the distribution of contraceptives).

Because Kucinich lacks standing, he has no probability of success on the merits. Furthermore, without standing, Kucinich is unable to prosecute this case. The Court therefore does not need to consider the other TRO factors before deciding that a TRO should not issue in this case. Nonetheless, the Court notes that even if Kucinich did have standing in this case, the Court would deny the motion for a TRO.

█ The facts as of January 28, 2002, the day of the TRO hearing, are, as Kucinich's attorney agreed at the hearing, quite different from the facts on January 25, 2002, the day Kucinich filed the motion for a TRO and Judge Manos declined to rule on it. Since midnight on January 26, 2002, the bulk of the conversion actions that Kucinich seeks to enjoin have already been implemented, and DFAS's R & A operations are being performed by ACS rather than by in-house employees. According to DFAS, 176 employees have retired, 93 have resigned, 151 have been separated, 273 have been placed in new positions with DFAS, and 363 have taken jobs with ACS. Def. Mem. at 3–4. Although the parties could no doubt quibble about the precise numbers, there is no dispute as to the ultimate meaning of these statistics. The in-house staff no longer

works for DFAS and has dispersed. If the Court were to issue a TRO, ACS would be enjoined from performing the R & A services and DFAS would be left with no staff to do the job. Many of the former employees would in fact be prohibited from being rehired as a result of new contractual obligations to ACS or to other employers and of retirement incentives offered by DFAS that prevent employees from returning to federal service for at least five years. *See id.* Because the transition has already taken place, the facts at this time do not favor issuing a TRO. The balance of hardships clearly favors DFAS, especially given the lack of any immediate harm to Kucinich—the only named plaintiff—if the TRO were not to issue. Furthermore, the public interest in seeing that R & A activities, upon which all U.S. military retirees and annuitants worldwide depend, continue to be performed without any major disruption would favor denial of the motion for a TRO. As a result, even if Representative Kucinich had standing, this Court would still have to deny his motion for a TRO at this late date.

## CONCLUSION

For these reasons, the Court dismisses this case *sua sponte* for lack of jurisdiction.

This order is final and appealable.

IT IS SO ORDERED.

## *ORDER*

The Court has filed its memorandum and order finding that it lacks subject matter jurisdiction in this case. Therefore,

IT IS ORDERED that this case is dismissed *sua sponte* for lack of jurisdiction.

IT IS FURTHER ORDERED that this judgment is final and appealable.